UNITED STATES of America
v.
Michael R. DOUGHERTY, Appellant.

UNITED STATES of America
v.
Michael SLASKI, Appellant.

UNITED STATES of America
v.
Robert T. BEGIN, Appellant.

UNITED STATES of America
v.
Dennis J. MOLONEY, Appellant.

UNITED STATES of America
v.
Joseph F. O'ROURKE, Appellant.

UNITED STATES of America
v.
Arthur G. MELVILLE, Appellant.

UNITED STATES of America
v.
JoAnn MALONE, Appellant.

Nos. 24318–24324.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 21, 1971.

Decided June 30, 1972.

Rehearing Denied in No. 24318
Oct. 26, 1972.

1114

Messrs. Addison M. Bowman, Washington, D. C., and Philip J. Hirschkop, Alexandria, Va., with whom Mr. William E. McDaniels, Washington, D. C. (all appointed by this Court), was on the brief, for appellants.

Mr. Roger M. Adelman, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty., at the time the brief was filed, and John A. Terry, Asst. U. S. Atty., were on the brief, for appellee. Mr. John F. Evans, Asst. U. S. Atty., and Messrs. Thomas C. Green and Stephen M. Schuster, Jr., Asst. U. S. Attys., at the time the record was filed, also entered appearances for appellee.

Before BAZELON, Chief Judge, LEVENTHAL, Circuit Judge, and ADAMS,* Circuit Judge, United States Court of Appeals for the Third Circuit.

LEVENTHAL, Circuit Judge:

Seven of the so-called "D.C. Nine" bring this joint appeal from convictions arising out of their unconsented entry into the Washington offices of the Dow Chemical Company, and their destruction

* Sitting by designation pursuant to 28 U.S.C. § 291(a) (1970).

of certain property therein. Appellants,[1] along with two other defendants who subsequently entered pleas of nolo contendere,[2] were tried before District Judge John H. Pratt and a jury on a three count indictment alleging, as to each defendant, one count of second degree burglary, 22 D.C.Code § 1801(b), and two counts of malicious destruction of property valued in excess of $100, 22 D.C.Code § 403. On February 11, 1970, after a six-day trial, the seven were each convicted of two counts of malicious destruction. The jury acquitted on the burglary charges but convicted on the lesser-included offense of unlawful entry. The sentences imposed are set forth in the margin.[3]

Appellants urge three grounds for reversal as follows: (1) The trial judge erred in denying defendants' timely motions to dispense with counsel and represent themselves. (2) The judge erroneously refused to instruct the jury of its right to acquit appellants without regard to the law and the evidence, and refused to permit appellants to argue that issue to the jury. (3) The instructions actually given by the court coerced the jury into delivering a verdict of guilty. On the basis of defendants' first contention we reverse and remand for new trial. To provide an appropriate mandate governing the new trial, we consider the second and third contentions, and conclude that these cannot be accepted.

## I. *The Record in District Court*

The undisputed evidence showed that on Saturday, March 22, 1969, appellants broke into the locked fourth floor Dow offices at 1030 – 15th Street, N.W., Washington, D.C., threw papers and documents about the office and into the street below, vandalized office furniture and equipment, and defaced the premises by spilling about a bloodlike substance. The prosecution proved its case through Dow employees who testified as to the lack of permission and extent of damage, members of the news media who had been summoned to the scene by the appellants and who witnessed the destruction while recording it photographically, and police officers who arrested appellants on the scene.

Initially, the court appointed separate counsel for each defendant. Following their arraignment on June 20, 1969, all save appellant Robert Begin elected interim joint representation by Philip Hirschkop, Addison Bowman and Caroline Nickerson. Mr. Begin was represented by Edward Bennett Williams. All attorneys were court-appointed.

At the pre-trial conference held on January 29, 1970, in his chambers, Judge Pratt indicated he had received a letter from Mr. Hirschkop to the effect that appellants JoAnn Malone, Arthur Melville, and Joseph O'Rourke no longer wished to be represented by counsel. On his own behalf, appellant Begin had written the Court requesting that the appointment of Mr. Williams be terminated, and that he be permitted a *pro se* defense. Judge Pratt deferred a ruling on the *pro se* motions in order to give the matter further consideration, observing that to waive counsel

is not quite as easy as merely getting up and saying that you want to represent yourself. You've got the matter of the waiver being knowing and intelligent, and we are going to take testimony on that; and furthermore, the possibility of prejudice, not only

1. Michael R. Dougherty, Michael Slaski, Robert T. Begin, Dennis J. Moloney, Joseph F. O'Rourke, Arthur G. Melville, JoAnn Malone.

2. Catherine Melville and Bernard Meyer.

3. Appellants Begin, Moloney and O'Rourke: one to three years imprisonment, to be placed on probation for three years after serving six months. Slaski: indefinite sentence pursuant to the Federal Youth Corrections Act, 18 U.S.C. § 5010(b). Dougherty and Malone: six months imprisonment on Count One and nine months to four years on Counts Two and Three, all terms to run concurrently. Melville: six months imprisonment on Count One and one to six years on each of Counts Two and Three, to run concurrently.

to themselves but also to their co-defendants. (Tr. 3)

Later in the conference he indicated how important he felt the lawyer's role was likely to be in achieving tranquility at trial:

> [L]et me emphasize as strongly as I can that the way this case is handled is presumably my responsibility, but the decorum in the courtroom—I'm talking particularly about the defendants themselves—will be affected to a great degree by the advice and example that they get from their own lawyers. (Tr. 14).

The day before, it seems, Judge Pratt had attended a seminar on the problems of disruption encountered in multi-defendant trials, and he was concerned that "there have been rumors that maybe some disruptive tactics are going to be employed." (Tr. 15, 17[4]). Defense counsel assured him that they knew of no such rumors and that they anticipated no disruptive behavior. In any event, Judge Pratt scheduled a hearing for February 3, 1970, on the four defendants' requests as a matter preliminary to the trial.

At a "supplementary" conference the next day, January 30, the Judge acceded to Mr. Williams's request that his associate, William McDaniels, be substituted as Begin's counsel of record. Mr. Williams's request stemmed from statements of emphatic, indeed vitriolic, dissatisfaction with Mr. Williams's representation contained in Begin's motion for a *pro se* defense.

At the February 3, 1970, hearing on the *pro se* motions, the four original movants were joined by appellant Dougherty. For approximately three-quarters of an hour the court heard from the five defendants and from their lawyers. The judge showed particular interest in the defendants' education, and specifically whether any of the five had had formal legal training. None had, although appellant Begin asserted he had "taken pains to familiarize (himself) with courtroom procedure." In general, the testimony showed that the five movants were quite articulate and highly educated. It also appeared that all five movants—indeed all defendants save appellant Slaski—were associated with a religious order, either at that time or in the recent past and, in varying degrees, had been active in work among the poor and underprivileged, in this country and in Latin America.

After a brief recess, the court denied defendants' motions in an oral opinion, set forth in the margin.[5] The judge in-

---

4. The judge had earlier denied a defense request for the larger ceremonial courtroom, saying "[i]f I can help it, this is not going to be a roman circus," transcript of Jan. 29, 1970, hearing, p. 3.

5. The opinion appears at Tr. 33–35:

> The defendants are charged in Count One, with burglary in the second degree. And in Counts Two and Three, with destroying private property. These charges are serious. The accumulative possible punishment which could be imposed on each of these defendants could total as much as 35 years imprisonment, and also, a fine.
>
> This Court conducted an examination of the moving defendants. There is no doubt that they are well educated people, and as far as the Court is concerned, there is no question about the matter of their motivation.
>
> However, they have indicated that none of them have ever studied common

law, and they indicated their unfamiliarity with the essential rules of evidence and procedure.

> Although it is expected that they will desire to consult with counsel before and during trial, this Court is under the opinion that such consultation would be inadequate under the circumstances in this case.
>
> A large number of defendants are involved here. Examination, cross-examination and objections made by five persons, totally unfamiliar with the rules of evidence and procedure, might not only disrupt the proceedings, it might also prejudice the jury and jeopardize the rights of their co-defendants.
>
> The right of a defendant to appear *pro se* in a criminal matter, cannot be isolated from the other elements of the fair and orderly administration of justice. [The judge cited United States v. Davis, 260 F.Supp. 1009 (M.D.Tenn.

dicated that he was not troubled by defendants' general educational background, nor, importantly, by their motivation. However, he emphasized their lack of formal legal training, the multidefendant context of the trial, and the seriousness of the charges. The interplay of those factors he felt created too great a risk of disruption of the trial, and risk of jury prejudice against movants and their co-defendants. After the judge delivered his ruling, there was some confused interchange between the court, counsel and several defendants. At Mr. Hirschkop's request, court was recessed in order that counsel and defendants could determine how to proceed in light of the judge's ruling.

When court reconvened after lunch, all defendants were present and a panel of prospective jurors sat in the rear of the courtroom. At that time the remaining four defendants, Catherine Melville, Dennis Moloney, Michael Slaski and Bernard Meyer, made oral motions to represent themselves. These new motions were prompted in large part by the judge's earlier emphasis on prejudice to co-defendants with counsel as a ground for denying the original motions. After some discussion between the court and the defendants, out of the presence of the veniremen, the judge, treating the four new motions as timely made, formally denied them for the reasons given in his oral opinion.

Some collateral matters were then disposed of, including a request—denied—by Mr. Hirschkop that Judge Pratt disqualify himself. When the court began its voir dire examination of prospective jurors, there was some dispute about the judge's decision to question the jurors himself rather than to follow the procedure of examination by counsel, but appellants do not bring that issue into this appeal. Similarly, appellants do not complain of the presence or absence of certain questions for the prospective jurors, about which there was controversy at the time.

Selection of the jury was reasonably rapid, requiring only a part of the afternoon of Feb. 3 and part of the next morning. As noted, the court conducted the voir dire. Defendants were, however, permitted to exercise their peremptory challenges *in propria persona*.

The trial formally began on the afternoon of February 4. Judge Pratt required that motions, objections, and examination of witnesses be made through counsel. He did, however, agree to permit each defendant to make a five minute opening statement and to testify, in narrative form, at reasonable length without a specific time limit. After the prosecution's opening statement, Mr. Hirschkop made a brief statement on behalf of all defendants. Then five of the defendants—including appellants

1966) ; United States v. Bentvena, 319 F.2d 916 (2d Cir.), cert. denied, 375 U.S. 940, 84 S.Ct. 345, 11 L.Ed.2d 271 (1963).] [T]he right of a defendant to appear *pro se*, despite the language of the Constitution, despite the language of the applicable statute, and despite Rule 44 of the Criminal Rules, may be denied when the trial court finds the defendants rights should [*sic*] not be sufficiently protected if he appeared on his own behalf. [Citing United States v. Davis, *supra*; United States v. Jones, 369 F.2d 217 (7th Cir. 1966), cert. denied, 386 U.S. 944, 87 S.Ct. 976, 17 L.Ed.2d 875 (1967).] [T]he right to appear *pro se* may also be denied when the trial court finds that this allowance would be likely to disrupt the proceedings. [Citing United States v.

Private Brands, Inc., 250 F.2d 554 (2d Cir. 1957) ; United States v. Mitchell, 138 F.2d 831 (2d Cir.), cert. denied, 321 U.S. 794, 64 S.Ct. 785, 88 L.Ed. 1083 (1943) ; Overholser v. DeMarcos, 80 U.S.App.D.C. 91, 149 F.2d 23, cert. denied, 325 U.S. 889, 65 S.Ct. 1579, 89 L.Ed. 2002 (1945).]

The Seventh Circuit Court of Appeals has specifically held, that a criminal defendant is denied his constitutional rights if he objects to appointment of competent counsel, where such defendant is without counsel. [Citing United States v. Jones, *supra*.]

After carefully weighing all the factors in this case, this Court concludes that in order to insure a fair and impartial trial, all defendants must be represented by counsel.

Dougherty, Begin and Arthur Melville—made opening statements.

The prosecution's case was completed by the end of the next day, February 5. Prior to the opening of the defense case, defendants Catherine Melville and Bernard Meyer entered pleas of *nolo contendere* to one count of malicious destruction of property; the remaining charges were dismissed; and they are not before us on this appeal.

On Friday, February 6, after an opening statement by Mr. Bowman, appellants O'Rourke and Malone made opening statements on their own behalf, as the other defendants had done prior to the Government's case. They directed their remarks, as had the others, to an attack on the role of Dow Chemical Company and other unspecified corporations in supporting American military efforts in the Vietnam War. When Sister Malone referred to Vietnam, Judge Pratt interjected: "the war in Vietnam is not an issue in this case." A disruption ensued. Events happened too quickly for the court reporter to provide a complete record. The court later inserted this description of what happened, Supplement to Transcript, p. 595:

> The record being unclear as to what transpired in the courtroom shortly before the Court adjourned Friday, February 6, 1970, the following is a recital of those events.

> Defendant JoAnn Malone, while making her opening statement, referred to the Vietnam War. (T. 594) The Court ruled that "the War in Vietnam is not an issue in this case." (T. 594) Defendant Arthur Melville rose to object and was ordered by the Court to be seated. Defendant Michael Slaski also objected and when he failed to obey the Court's order to be seated, the Marshals were ordered to seat him. (T. 595) While this was taking place, two spectators in the rear of the courtroom then stood and shouted to the bench concerning the relevancy of the War in the case on trial. Marshals moved to eject these two persons. The first was removed without incident. While the second was being ejected with some difficulty, a woman member of the DC–Nine Defense Committee seated in the front row in back of the defendants rose and ran to the back of the courtroom to impede the Marshals and assist the two spectators being removed. When the Marshals resisted her, she screamed at them. Defendant Michael Slaski then wrestled free from the Marshals who were attempting to seat him, hurdled the rail and engaged in an altercation with the Marshals at the rear of the courtroom. During these events the jury was ushered from the courtroom. The Court ordered the courtroom cleared and took a recess. It is reported that the fighting involving defendant Slaski ceased after two or three minutes and the Marshals began clearing the courtroom amid shouts of "pigs" and obscenities. Loud shouting occurred during the entire incident. A number of spectators refused to leave the courtroom and had to be ejected forcibly. The Court returned after the courtroom had been cleared and the press, counsel and the defendants had been readmitted. The jury was recalled, admonished to disregard what it had seen, and sent home. The Court then adjourned until Monday, February 9, 1970.

When the trial resumed on Monday, February 9, defendant Slaski was cited for contempt for his role in the disturbances and the judge sternly admonished the spectators and remaining defendants against further outbreaks. Appellants Slaski and Moloney did not make opening statements. After appellant Malone finished her statement, the case for the defense began. It consisted entirely of defendants' testimony. Appellants Arthur Melville, O'Rourke, Malone and Begin testified. During the testimony there were several further disruptions requiring a brief recess at one point and ejection of a spectator from the court-

room at another.[6] The judge confined closing argument to counsel. He instructed the jury on the three counts of each indictment as well as on the lesser-included offense of unlawful entry under the burglary count. He refused to instruct the jury that it could disregard the law as he gave it to them, and refused to instruct the jury that "moral compulsion" or "choice of the lesser evil" constituted a legal defense.

## II. *The Right of Pro Se Representation*

In defendants' view, Judge Pratt violated their constitutional and statutory rights when he refused to permit them to represent themselves. They say the right to dispense with counsel is correlative to the guarantee of the right to counsel and is therefore "implicit" in the Sixth Amendment. They rely as well on 28 U.S.C. § 1654 which provides:

In all courts of the United States the parties may plead and conduct their own cases personally or by counsel as, by the rules of such courts, respectively, are permitted to manage and conduct causes therein.

The Government responds that a defendant's right to represent himself is not protected by the Sixth Amendment but only exists by virtue of § 1654, and that this is significant (a) because statutory rights are generally subject to the "harmless error" principle, and (b) § 1654 rights can be limited when, in the judge's view, they would be likely to lead to disruption of the trial or threaten to interfere with effective presentation of the defendant's case.

## A. *Absence of Controlling Precedent on Source of* Pro Se *Right*

The Supreme Court has never directly determined whether the Constitution guarantees the *pro se* right. Appellants rely on Adams v. United States ex rel. McCann, 317 U.S. 269, 279, 63 S.Ct. 236, 242, 87 L.Ed. 268 (1942) where the Court observed:

[t]he right to assistance of counsel and the correlative right to dispense with a lawyer's help are not legal formalisms. They rest on considerations that go to the substance of an accused's position before the law. . . [T]he Constitution does not force a lawyer upon a defendant. He may waive his Constitutional right to assistance of counsel if he knows what he is doing and his choice is made with eyes open.

However, *Adams's* "correlative right" language was not an essential ingredient of its holding, which was simply that a defendant who has intelligently waived his right to counsel may also waive his right to a jury trial. Moreover, in Singer v. United States, 380 U.S. 24, 85 S.Ct. 783, 13 L.Ed.2d 630 (1965), holding a defendant's waiver of right to a jury trial subject to the assent of the prosecution and the trial judge, the Court said that "the ability to waive a constitutional right does not ordinarily carry with it the right to insist on the opposite of that right." 380 U.S. at 34–35, 85 S.Ct. at 789. It pointed out that

[t]he Constitution recognizes an adversary system as the proper method of determining guilt, and the Government, as a litigant, has a legitimate interest in seeing that cases in which it believes a conviction is warranted are tried before the tribunal which the Constitution regards as most likely to produce a fair result. *Id.* at 36, 85 S.Ct. at 790.[7]

---

6. There were several further, though considerably less serious, instances of questionable behavior by defendants. In addition to Slaski, appellants Dougherty and Melville were cited for contempt during the trial, see Tr. 733–36. The sentences for these offenses, violations of 18 U.S.C. § 401, were suspended when the court imposed sentences on the jury verdicts, on May 6, 1970.

7. We also note that in Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1947), the Court referred to a defendant's *"constitutional prerogative* of being present in person at each significant stage of a felony prosecution, . . . and to his *recognized privilege* of conducting his own defense at the trial." (Emphasis added.)

There are conflicting indications from the circuits. The Second Circuit in United States v. Plattner, 330 F.2d 271 (2d Cir. 1964), recognized constitutional status for the *pro se* right. In accord with *Plattner*, see Lowe v. United States, 418 F.2d 100 (7th Cir. 1969), cert. denied 397 U.S. 1048, 90 S.Ct. 1378, 25 L.Ed.2d 660 (1970); United States v. Warner, 428 F.2d 730 (8th Cir. 1970), cert. denied 400 U.S. 930, 91 S.Ct. 194, 27 L.Ed.2d 191 (1971); United States v. Pike, 439 F.2d 695 (9th Cir. 1971); Hodge v. United States, 414 F.2d 1040 (9th Cir. 1969). *But compare* Juelich v. United States, 342 F.2d 29 (5th Cir. 1965); Van Nattan v. United States, 357 F.2d 161 (10th Cir. 1966).

In our court, Brown v. United States, 105 U.S.App.D.C. 77, 264 F.2d 363 (en banc 1959), left the issue unresolved. Reversal was sought because the trial judge failed to instruct a defendant of his right to represent himself when his court-appointed attorney informed the court that defendant was dissatisfied with the attorney's pessimism about the outcome of the case. There was no opinion for a majority of the court. Judge Miller, joined by Judges Prettyman, Danaher and Bastian, stated that the *pro se* right is statutory only, and therefore (a) defendant must assert the right in order to be entitled to it and (b) in any event no reversal was required since no prejudice could be discerned.

The opinions of the other five judges are consistent with a view that the Constitution is the basis for the right, although only one expressly discussed its source. Judge Burger, concurring in part, differed with the others voting to affirm because he treated defendant's expression of "dissatisfaction" as the equivalent of a request for removal of counsel, but held it within the court's discretion to deny the request so long

as it was sufficiently apprised of the cause of the "dissatisfaction."

The four dissenters joined in an opinion stating that the reasons for the "dissatisfaction" were not made sufficiently clear to the court to permit the exercise of its informed discretion on the matter, and hence the judge should have inquired further into the basis for defendant's attitude and should have specifically informed defendant of his right to proceed alone. The *pro se* alternative, they felt, is one of fundamental importance, and a defendant can make an informed decision on how best to conduct his defense only if he is made aware that he is free to dispense with counsel. The principal dissent, however, made no mention of the Constitution. Only Judge Bazelon, in a separate dissent, said the *pro se* right was grounded in the Constitution.

B. *Need for Recognition of Statutory Right—If Timely Asserted, Not Waived, And Accompanied by Waiver of Right to Counsel*

The Government says the *pro se* right is statutory and subject to "extensive qualifications," discerning in the decisions seven "factors" on the basis of which the *pro se* right may be partially or entirely denied.[8]

This case does not require final resolution of the constitutional question. That would be unavoidable had Congress attempted to narrow or qualify the *pro se* right along the lines advocated by the Government on this appeal. But that is not the case. The right of *pro se* representation was enacted by our very first Congress. The language declaring the *pro se* right is not qualified, see 28 U.S.C. § 1654. The statute was passed in a context of colonial tribunals largely manned by laymen, and of pioneer modes of thought emphasizing the

---

8. Timeliness; the interest of preserving orderly procedures in court; the complexity of the case; the necessity of ensuring that the defendant's rights are protected; the interest of having the guiding hand of counsel present; the interest of the public in a trial which is fair to both sides and in which justice is done; the seriousness. of the charges. *See* government brief, pp. 33–34.

virtues of common sense and self-reliance.[9] Its constitutional aura is underscored by the proposal the very next day of the Sixth Amendment.[10]

In sum, whether or not the right of *pro se* representation has a constitutional foundation it is patently a statutory right, see § 1654; this right was not only conferred by Congress in 1789 but. has wide reverberation in organic state law [11] and was recognized by Congress as a fundamental right. We conclude that this right must be recognized if it is timely asserted, and accompanied by a valid waiver of counsel, and if it is not itself waived, either expressly, or constructively, as by disruptive behavior during trial.[12]

The precedents relied on by the Government as subjecting the *pro se* right to "extensive qualifications" do no more than establish these basic elements: timely assertion; need for intelligent waiver of counsel; and possibility of waiver of the *pro se* right. A number of cases involved the special circumstance of defendants whose mental capacity was impaired.[13] The bulk of

---

9. See National Commission on Law Observance and Enforcement, Report on Criminal Procedure, p. 27 (1931).

10. As Judge Medina pointed out in *Plattner, supra,* 330 F.2d at 274, the Sixth Amendment was proposed by Congress one day after Section 35 of the Judiciary Act of 1789, the substantially verbatim forerunner of 28 U.S.C. § 1654, was signed by President Washington.

The bill was drafted and enacted at a time when there was a "current state of incertitude regarding the probability of constitutional amendment." J. Goebel, Antecedents and Beginnings to 1801, p. 490, vol. 1, History of the Supreme Court (Oliver Wendell Holmes Devise, Macmillan Co. 1971).

11. The right of pro se representation is expressly recognized in organic law of 38 states. See Ala.Const. Art. 1, § 6; Ariz.Const. Art. 2, § 24, A.R.S.; Ark. Const. Art. 2, § 10; Cal.Const. Art. 1, § 13; Colo.Const. Art. 2 § 16; Conn. Const. Art. 1, § 8; Del.Const. Art. 1, § 7; Fla.Const. Art. 1, § 16, F.S.A.; Idaho Const. Art. 1, § 13; Ill.Const. Art. 2, § 9; Ind.Const. Art. 1, § 13; Kans.Const.Bill of Rights, § 10; Ky. Const.Bill of Rights, § 11; La.Const. Art. 1, § 9; Mass.Const. Part 1, Art. 12; Me.Const. Art. 1, § 6; Miss.Const. Art. 3, § 26; Mo.Const. Art. 1, § 18(a); Mont.Const. Art. 3, § 16; Neb.Const. Art. 1, § 11; Nev.Const. Art. 1, § 8; N.H.Const. Part 1, Art. 15; N.M.Const. Art. 2, § 14; N.Y.Const. Art. 1, § 6; N.D.Const. Art. 1, § 13; Ohio Const. Art. 1, § 10; Okla.Const. Art. 2, § 20; Oreg.Const. Art. 1, § 11; Pa.Const. Art. 1, § 9, P.S.; S.C.Const. Art. 1, § 18; S.D.Const. Art. 6, § 7; Tenn.Const. Art. 1, § 9; Tex.Const. Art. 1, § 10; Utah Const. Art. 1, § 12; Vt.Const. Chapter 1, Art. 10; Wash.Const. Art. 1, § 22; Wis.Const. Art. 1, § 7; Wyo.Const. Art. 1, § 7; Wyo.Const. Art. 1, § 10.

It was held binding on the states in United States ex rel Maldonado v. Denno, .348 F.2d 12 (2d Cir. 1965). *See also* Manson v. Pitchess, 317 F.Supp. 816 (C.D.Calif.1970). We need express no opinion on this point.

12. We are fortified in this conclusion by language in Price v. Johnston, *supra,* 334 U.S. at 285, 68 S.Ct. 1049, wherein the Court suggested, albeit in dictum, that the "recognized privilege" embodied in § 1654, though "limited" following conviction and incarceration, "is . . . otherwise unqualified."

13. United States v. Davis, 365 F.2d 251 (6th Cir. 1966); Overholser v. DeMarcos, 80 U.S.App.D.C. 91, 149 F.2d 23, cert. denied, 325 U.S. 889, 65 S.Ct. 1579, 89 L. Ed. 2002 (1945); Manson v. Pitchess, 317 F.Supp. 816 (C.A.Cal.1970); United States v. Davis, 260 F.Supp. 1009 (E.D. Tenn.1966).

The Supreme Court has indicated though not held that an accused may be competent to stand trial and yet be incompetent to waive his right to counsel. Westbrook v. Arizona, 384 U.S. 150, 86 S.Ct. 1320, 16 L.Ed.2d 429 (1966). The Ninth Circuit apparently does not even recognize that limitation of the *pro se* right, see United States v. Odom, 423 F.2d 875 (9th Cir. 1970). Such a limitation, if it exists, suggests that there is a point of incompetency, short of complete incapacity, where a defendant is able to understand the nature of the charges against him and to assist in the preparation of his defense, yet does not have the capacity to waive counsel and undertake representation of himself.

Obviously, appellants intelligently waived their right to counsel.

the cases cited to us involved requests made after commencement of trial,[14] and do no more than apply the recognized principle that the fundamental right to conduct the case *pro se* is one that must be claimed timely, before the trial begins. Just as a defendant who has unrestricted right to retain counsel of his own choosing must seek permission of the court once his choice has been made, to select a different retained counsel, and is subject to the sound discretion of the court when he seeks to make a change after his trial has commenced, so a defendant must obtain the court's permission when he seeks to make a change in order to select himself as counsel.

 When the *pro se* right is claimed after trial has begun, the court exercises its discretion. It may weigh the inconvenience threatened by defendant's belated request against the possible prejudice from denial of defendant's request. In exercising discretion the judge may take into account the circumstances at the time, whether there has been prior disruptive behavior by defendant, whether the trial is in an advanced stage, etc. *E. g.,* Seale v. Hoffman, *supra,* note 14; United States v. Foster, 9 F.R.D. 367 (S.D.N.Y.1949). The right to self-representation, though asserted before trial, can be lost by disruptive behavior during trial, constituting constructive waiver. But that is a far different situation from that presented by the instant case, where appellants unequivocally claimed the right to represent themselves, see Brown v. United States, *supra,* 105 U.S. App.D.C. at 81, 264 F.2d at 367 (Burger, J.), United States ex rel. Higgins v. Fay, 364 F.2d 219 (2d Cir. 1966), well in advance of the beginning of trial and selection of the jury, see United States ex rel. Maldonado v. Denno, 348 F.2d 12 (2d Cir. 1965); *cf.* United States v. Thomas, 146 U.S.App.D.C. 308, 450 F.2d 1355 (1971).

### C. *"Possible" Disruption as a Basis for Denying Pro Se Defense*

The Government seeks to sustain the denial of appellants' *pro se* motions on a theory of "possible disruption." A list of five factors is offered [15] which, it is said, "taken together" support the judge's finding of risk of disruption.

 Given the general likelihood that *pro se* defendants have only rudimentary acquaintanceship with the rules of evidence and courtroom protocol, a measure of unorthodoxy, confusion and delay is likely, perhaps inevitable, in *pro se* cases.[16] The energy and time toll on the

---

14. United States v. Catino, 403 F.2d 491 (2d Cir. 1968), cert. denied, 394 U.S. 1003, 89 S.Ct. 1598, 22 L.Ed.2d 780 (1969) ; United States v. Conder, 423 F. 2d 904 (6th Cir. 1970), cert. denied, 400 U.S. 958, 91 S.Ct. 357, 27 L.Ed.2d 267 (1971) ; Butler v. United States, 317 F. 2d 249 (8th Cir.), cert. denied sub nom, Benedec v. United States, 375 U.S. 836, 84 S.Ct. 67, 11 L.Ed.2d 65 (1963) ; Seale v. Hoffman, 306 F.Supp. 330 (N.D.Ill. 1969).

As to one of the Government's precedents, United States v. Private Brands, 250 F.2d 554 (2d Cir. 1957), it has been displaced by United States v. Plattner, *supra.*

15. Outside pressures and publicity; the large number of defendants; the nature of the offenses and appellants' motivations; appellants' erroneous view of the nature of a criminal trial and the scope of the evidence which could be entertained there; actual disruptive behavior of defendants before the *pro se* rulings were made. Government brief, pp. 37–40.

16. The framers of the Judiciary Act of 1789 and the Sixth Amendment were undoubtedly aware that *pro se* defendants are likely to say and do things that would constitute manifest irregularities if done by members of the bar. A dramatic instance came in United States v. Lyon, Fed.Cas.No.8,646, a 1799 trial, for violation of the Sedition Act, against a truculent Congressman charged with publishing a libel that considerations of public welfare had been swallowed up in the Executive's continuous grasp for power, unbounded thirst for ridiculous pomp, foolish adulation and selfish avarice. Justice Paterson presided at the trial. Lyon, conducting his own defense, actually asked the judge whether he had not frequently dined with the President and observed his ridiculous pomp and parade.

trial judge, as fairness calls him to articulate ground rules and reasons that need not be explained to an experienced trial counsel, can be relieved, at least in part, by appointment of an amicus curiae to assist the defendant.[17] If defendant refrains from intentionally obstructive tactics, amicus would be available to provide advice on procedure and strategy. The utility of an amicus appointment is dependent on explanation to and cooperation by defendant, and on understanding, too, that he may claim with some merit that his *pro se* rights include his right to appear before the jury in the status of one defending himself, and that this is defeated if a too conspicuous role is played by an attorney, unless it clearly appears to the jury that he does not have the status of defense counsel.[18]

On the other hand, a potentially unruly defendant may and should be clearly forewarned that deliberate dilatory or obstructive behavior may operate in effect as a waiver of his *pro se* rights and, in that event, amicus will be ready to assume exclusive control of the defense.[19] The Supreme Court has recently emphasized that even constitutional litigation prerogatives of a defendant are available to give choice in the conduct of a trial, and do not extend so far as to permit subversion of the core concept of a trial. Illinois v. Allen, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed. 2d 353 (1970). The same principle means that obstreperous behavior may constitute waiver of the *pro se* right.[20]

Appointment of amicus counsel would not have resolved all the problems pre-

Justice Paterson replied that he had dined rarely with the President, and had never seen pomp or parade but rather much plainness. See Goebel, op. cit. *supra*, note 10, p. 638.

At an 1800 trial Thomas Cooper, *pro se*, was not permitted to subpoena the President, but he "was given great latitude in what he was permitted to offer in his defense." Thus Justice Chase issued subpoenas at the defendant's request to members of Congress. Goebel, *supra*, p. 640.

17. See United States v. Spencer, 439 F.2d 1047 (2d Cir. 1971); Lee v. Alabama, 406 F.2d 466 (5th Cir. 1969), cert. denied, 395 U.S. 927, 89 S.Ct. 1787, 23 L. Ed.2d 246 (1969); Bayless v. United States, 381 F.2d 67 (9th Cir. 1967); Brown v. United States, *supra*, 105 U.S. App.D.C. at 83, 264 F.2d at 369 (Burger, J., concurring).

The *Lee* decision states that a defendant is not entitled to "hybrid" representation in open court—both *pro se* and by counsel. *See* generally Annotation, 77 A.L.R.2d 1233 (1961). *But see* Bayless v. United States, *supra*.

18. There is a distinction in function between an amicus appointed to assist defendant and one appointed to assist the court. The latter may call witnesses and ask questions, without reference to the defendant, under the same authority that permits the judge himself to take such action in the interest of justice. *Compare* United States v. Brown, *supra*, 105 U.S. App.D.C. at 83, 264 F.2d at 369 (concurring opinion of Judge Burger). The

ABA Standards (*infra*, note 9) contemplate a "standby counsel" with both functions.

19. *See* Standards Relating to the Function of the Trial Judge, Recommended by the Advisory Committee on the Judge's Function, American Bar Association Project for Criminal Justice, § 6.7 (Tentative Draft of April 21, 1972, as approved by the House of Delegates, July 1971):

§ 6.7. Standby counsel for defendant representing himself.

When a defendant has been permitted to proceed without the assistance of counsel, the trial judge should consider the appointment of standby counsel to assist the defendant when called upon and to call the judge's attention to matters favorable to the accused upon which the judge should rule on his own motion. Standby counsel should always be appointed in cases expected to be long or complicated or in which there are multiple defendants.

*Accord*, United States v. Spencer, *supra* note 17, 439 F.2d at 1051.

20. *Allen* involved a waiver, of one's right to be present at the trial, by disruptive behavior. The Court emphasized however that the right to be present could be reclaimed by a simple promise not to engage in further disruption, 397 U.S. at 343, 90 S.Ct. 1057. We think a similar rule may be inappropriate regarding reclamation of the *pro se* right. Unlike a change in the physical location of defendant, a change from *pro se* representation and back again is likely to promote incoherence and destroy the jury's under-

sented by *pro se* defenses in the multi-defendant context involved in this case. Thus, the prospect of repetitious interrogation of witnesses would persist. But the joint trial that the prosecution seeks in the interest of efficiency cannot set aside the fundamental right of *pro se* representation. The trial judge must proceed by skill and suasion, by obtaining defendants' cooperation, not by denying their *pro se* rights.

 We need not here consider whether or in what circumstances withholding of reasonable cooperation may be held equivalent to unruly action as a waiver of the right of self-representation. In the case before us, defendants and counsel assured the court, on several occasions, of their lack of disruptive intent, *e. g.*, Tr. 23, 24. The judge in his oral opinion noted that his fears of disruption did not stem from concern over defendants' "motivations." Furthermore, the record shows how reasonable cooperation was obtained from defendants, by a reasonable accommodation of interests. When defendants expressed concern over their exclusion from bench conferences, Judge Pratt made, and defendants accepted (Tr. 333–335), a suggestion permitting a "representative" defendant to participate in bench conferences as an observer. A similar approach might have obviated any serious problems of repetitious interrogation.[21] In the last analysis, however, if the assertion of a *pro se* right makes a multi-defendant trial unmanageable, or unfair to the other defendants, the remedy lies in severance. Rule 14, F.R.Crim.P.

 In effect the unqualified right of self representation rests on an implied presumption that the court will be able to achieve reasonable cooperation. The possibility that reasonable cooperation may be withheld, and the right later waived, is not a reason for denying the right of self representation at the start.

### D. Lack of Foundation for Government Claims of Prior Disruptive Behavior

The Government argues that in this case there was disruptive behavior on the part of defendants which sustains the judge's denial of *pro se* representation. We assume, without deciding, that where there has been experience with the particular defendants that is plainly identifiable as disruptive in character, such as to overturn the premise of reasonable cooperation, and permit a finding of anticipatory breach and waiver, that would be a predicate for denying the *pro se* right. We do not think any such predicate appears in this case.

 We begin by rejecting the Government's approach of using "disruptive" incidents following the denial of the *pro se* motions as reasons to support that denial.[22] This is like using the fruit of an unreasonable search to provide a cause making the search reasonable. Nearly all of the incidents cited by the Government concerned assertions of the right to self-representation. It would be anomalous to hold that the denial of one's rights can be justified by reference to the nature of subsequent complaints protesting that denial.

As to defendants' actions prior to the denial of their *pro se* requests, these

---

standing. Reclamation of the *pro se* right after disruptive behavior is properly a matter left to the trial court's sound discretion.

21. At one point, Mr. Hirschkop on behalf of defendants made an actual proffer of limited examination, if defendants were permitted to participate: "We would be more than happy to limit examination of witnesses to three people. I assume Mr. Bowman and I will be both examining and the independent defendant." Tr. 223.

22. At the end of the first day of trial, Judge Pratt remarked, Tr. 223:
 I think the performance today has shown the wisdom of having appointed counsel to advise and preclude a disruptive trial. It would be impossible to conduct this trial with nine people representing themselves or even a portion of them. I think this has been demonstrated here.

were not the kind of "disruptive" actions that warranted denial on that basis alone. We are aware of the occasions prior to the *pro se* ruling when defendants interrupted the pre-trial hearing without obtaining the court's prior leave. However, most of the interruptions stemmed from defendants' confusion over the exclusion of the public from the pre-trial hearing, a matter that had been arranged at the pre-trial conference in which defendants had not participated, and which was subject to reasonably prompt clarification without repetition.

Thus, during Sister Malone's testimony, in which she inquired of the court the reasons for the exclusion of the public, appellant Dougherty interrupted to observe that he thought the courtroom was large enough to accommodate the people who could be expected to attend. This followed by moments an "interruption" by Mr. O'Rourke to make a request, joined in by Sister Malone, that two of their relatives be permitted to observe the progress of the hearing— a request that the court granted.

None of the incidents can be characterized as "disruptive" in the sense of evincing defendants' intent to upset or unreasonably delay the hearing. Indeed to some extent the defendants, not trained in courtroom decorum, had reason to suppose their behavior was within proper bounds. At the hearing and during the early trial, Judge Pratt not only took considerable care to explain his ruling on the *pro se* motions, but also permitted the defendants to participate personally in jury selection. The record also shows that Judge Pratt engaged defendants in colloquies on various matters directly rather than through counsel. We do not disapprove, we rather commend, Judge Pratt's willingness to handle this case with some flexibility. The Supreme Court has emphasized that one of the most important functions of criminal trials is, within reason, to make plain to defendants and society at large that justice is done in our courts,[23] and Judge Pratt's approach likely had that effect in this case. But the latitude previously granted to appellants must be taken into account in appraising whether their later requests manifest disruptive conduct.[24] We cannot agree their pre-ruling behavior can be considered as so "disruptive" as to constitute a constructive, anticipatory waiver of a fundamental right.

### E. *Application of the Doctrine of Harmless Error*

The Government finally contends that, assuming *arguendo* error in the denial of *pro se* defense, reversal as inappropriate because no prejudice resulted. We may assume, without deciding, that the harmless error doctrine—either in its ordinary formulation, or the more refined "harmless constitutional error" version[25]—applies even in cases involving denial of a fundamental statutory right approximating or equalling the rights expressly stated in the Constitution. But we do not think it applicable to this case.

The principal characteristic of "harmless error" doctrine is its "result-orientation." Its normal operation is in cases where the challenged error concerns

---

23. Offutt v. United States, 348 U.S. 11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11 (1954) ("Justice must satisfy the appearance of justice.") ; Adams v. United States ex rel McCann, 317 U.S. 269, 279, 63 S.Ct. 236, 87 L.Ed. 268 (1942) ("The public conscience must be satisfied that fairness dominates the administration of justice.").

24. *See* Tr. 358:

> THE COURT : You will not ask any questions.
>
> * * * * *

> THE DEFENDANT MALONE : You allowed us a compromise before, I believe.
>
> THE COURT : There is no compromise on this.
>
> THE DEFENDANT MALON[E] : Why? What is the difference?
>
> THE COURT : I'm not giving you any explanation. If I am wrong, the Court of Appeals can tell you.

25. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

a right given the defendant in order to permit his defense to operate at maximum competence [26] or to insulate him from the effects of suspect evidence.[27] In such cases there is reason to consider whether claimed error is harmless because it plainly did not affect the result adversely to defendant, for then the reason for the right lapses.

Courts have recognized a measure of result-orientation in the right of *pro se* representation. The Second Circuit, for example, perceives a basis for the *pro se* right in the need not to force a defendant to accept a lawyer in whom he has little confidence. Without such confidence, lawyer-client communication is likely to be unsatisfactory and "defendant may be better off representing himself," United States ex rel. Maldonado v. Denno, *supra*, 348 F.2d at 15.

 However, a salient aspect of the *pro se* right, in our view, is directed to considerations distinct from the objective of achieving what would be the best result in the litigation from a lawyer's point of view. As the Supreme Court said in Adams v. United States ex rel. McCann, *supra*, 317 U.S. at 279, 63 S.Ct. at 241, the "right to dispense with a lawyer's help . . . . rest[s] on considerations that go to the substance of an accused's position before the law." It is designed to safeguard the dignity and autonomy of those whose circumstances or activities have thrust them involuntarily into the criminal process. An accused has a fundamental right to confront his accusers and his "country," to present himself and his position to the jury not merely as a wit-

ness or through a "mouthpiece," but as a man on trial who elects to plead his own cause. He is not obliged to seek what counsel would record as a victory but what he sees as tantamount to condemnation or doubt rather than vindication. A defendant has the moral right to stand alone in his hour of trial. The denial of that right is not to be redeemed through the prior estimate of someone else that the practical position of the defendant will be enhanced through representation by another, or the subsequent conclusion that defendant's practical position has not been disadvantaged.

 In guaranteeing counsel for the accused, the Sixth Amendment conferred a right for the benefit of the accused. As implemented by Congress, this right is not an imperative requirement that may be thrust upon him when in his judgment, as a person without impaired mental capacity, it is against his interest. Even if the defendant will likely lose the case anyway, he has the right—as he suffers whatever consequences there may be—to the knowledge that it was the claim that he put forward that was considered and rejected, and to the knowledge that in our free society, devoted to the ideal of individual worth, he was not deprived of his free will to make his own choice, in his hour of trial, to handle his own case.[28]

In the case at bar defendants believed they would be vindicated by their peers by presenting their positions without law-trained counsel as intermediary. They may or may not be right about the relative effectiveness of a lawyer's presentation of their case. Ordinarily repre-

26. *E. g.*, United States v. Missler, 414 F.2d 1293 (4th Cir. 1969), cert. denied, 397 U.S. 913, 90 S.Ct. 912, 25 L.Ed.2d 93 (1970) (failure of government to comply with disclosure requirements of Jencks's Act, 18 U.S.C. § 3500, held harmless error).

27. *E. g.*, Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968) (existence of "independent source" may permit identification of suspect despite use of suggestive identification procedure).

28. The defendant's free will to handle his own case may not be as absolute as his right, say, to withhold consent for surgery needed to save his life. The judge's authority to insist on intelligent assertion will presumably suffice to take care, *e. g.*, of cases where *pro se* representation would jettison defenses in a trial that would be tantamount to a travesty on justice. There is also the judge's authority to ask questions and call witnesses, to appoint amicus curiae, to set aside a conviction and grant a new trial.

sentation by an attorney has structure and clarity that enables a jury to better understand defendants' positions. Presentation of a case *pro se* will often be artless and confusing. Yet the normal disadvantage of confusion may be offset by the enhanced intensity and appearance of greater sincerity of a defendant's presentation.[29]

While we cannot apply the doctrine of "harmless error" in case of denial of right of *pro se* representation on the ground that this would likely have resulted in the same verdict as counseled representation, a different question arises as to whether the overall format of the trial was such, in terms of the latitude given to the defendants, that they in effect had the substance though not the form of *pro se* representation.

This is a closer question, for as we have noted the judge made a painstaking effort to take some account of defendants' positions in the courtroom, and indeed gave permission to defendants to make brief opening statements and to testify informally in narrative fashion.

In the last analysis, the judge's efforts did not suffice to dissipate the erroneous denial of *pro se* representation. The court's indulgence of defendants undoubtedly appeared as exactly that, a matter of grace—as something "extra" given to them beyond their due rights—which undercuts the objective of preserving defendants' personal autonomy and responsibility in the courtroom. The format provided by the judge allowed for brief opening statements by defendants not as representing themselves, as they had a right to appear, but as a supplement to the counsel appointed to represent them. The denial of the defendants' right to make closing statements removed them from the place of responsibility at the climax of the trial— when they would be summing up their positions in a context of a summing up by prosecution counsel. Presentation of closing statements by the defendants was originally promised and then taken away because of their disruptions. But the vast bulk of the incidents cited in the Government's brief as such disruptions—81 out of 89—were essentially colloquies in which the defendants were asserting their *pro se* rights. And except for the eruption as to the Vietnam war "issue," the other incidents were relatively minor in character. But the abiding difficulty remains—that one cannot fairly reason backward, from the conduct of a defendant at a trial where he was denied the right to represent himself, to what his conduct would have been if at the outset the trial judge recognized that right and at the same time clarified the responsibilities of representation.

In finding error because of the denial of the *pro se* right we are not unmindful of the fact that this trial presented Judge Pratt with difficult problems, and that in many respects his conduct of the trial reflected a commendable approach, a humane and flexible spirit that would have served, if the right of self-representation had been granted, to curb unwelcome consequences of that right.[30]

---

**29.** We are not referring here to the tactical advantage that leads a defendant to claim *pro se* representation, that he can present his demeanor, and sometimes "testify," without being subject to impeachment or cross-examination. Ironically, this tactical advantage would be most appreciated by a lawyer on trial, and yet he would be likely to have his *pro se* choice accepted without question.

**30.** The matter of *pro se* defenses in this case presented a difficult issue of law which it became the duty of Judge Pratt to decide at the outset. We do not agree with his decision denying pro se representation. But the transcript clearly demonstrates that the judge acted from the first, and continued without impatience to act, in a painstaking effort to take into account the position and needs of defendants, in a difficult and free-form situation—which was in more than one sense a trial. He was sensitive and responsive, even over prosecution objection, *e. g.*, Tr. 673, to the desirability of informality and flexibility in structuring presentation of

If it had not been for that threshold error, the trial would have had a different character. In view, however, of both the quality of, and limitations on, the permissions granted to defendants, we cannot say that the procedure followed was the equivalent of according the right of self-representation that was erroneously denied at the outset.

## III. *The Issue of Jury Nullification*

Our reference to the "intensity" factor underlying the *pro se* right should not be understood as embracing the principle of "nullification" proffered by appellants. They say that the jury has a well-recognized prerogative to disregard the instructions of the court even as to matters of law, and that they accordingly have the legal right that the jury be informed of its power. We turn to this matter in order to define the nature of the new trial permitted by our mandate.

There has evolved in the Anglo-American system an undoubted jury prerogative-in-fact, derived from · its power to bring in a general verdict of not guilty in a criminal case, that is not reversible by the court. The power of the courts to punish jurors for corrupt or incorrect verdicts, which persisted after the medieval system of attaint by

another jury became obsolete, was repudiated in 1670 when Bushell's Case, 124 Eng.Rep. 1006 (C.P. 1670) discharged the jurors who had acquitted William Penn of unlawful assembly. Juries in civil cases became subject to the control of ordering a new trial; no comparable control evolved for acquittals in criminal cases.

The pages of history shine on instances of the jury's exercise of its prerogative to disregard uncontradicted evidence and instructions of the judge. Most often commended are the 18th century acquittal of Peter Zenger of seditious libel, on the plea of Andrew Hamilton, and the 19th century acquittals in prosecutions under the fugitive slave law. The values involved drop a notch when the liberty vindicated by the verdict relates to the defendant's shooting of his wife's paramour, or purchase during Prohibition of alcoholic beverages.[31]

Even the notable Dean Pound commented in 1910 on positive aspects of "such jury lawlessness."[32] These observations of history and philosophy are underscored and illuminated, in terms of the current place of the jury in the American system of justice, by the empirical information and critical insights and analyses blended so felicitously in H. Kalven and H. Zeisel, The American Jury.[33]

> defendants and their case to the jury— whether by permitting defendants to make opening statements, Tr. 301 et seq., to participate in bench conferences, *e. g.*, Tr. 402, or to inspect prosecution evidence before admission, *e. g.*, Tr. 532. His efforts at moderating the potentially harsh effects of his denial of *pro se* defenses were in the highest traditions of our courts. Save for the crucial error in his initial ruling, these determinations by Judge Pratt showed the kind of approach that will hopefully dilute the troublesome aspects of *pro se* representation.

31. Kalven and Zeisel, op. cit. *infra* note 33, at p. 310 (Fugitive Slave Law), at p. 292, note 10 (Prohibition acquittals statistics, showing variation by districts.)

32. See R. Pound, Law in Books and Law in Action, 44 Am.L.Rev. 12, 18 (1910) : "Jury lawlessness is the greatest corrective of law in its actual administration.

> The will of the state at large imposed on a reluctant community, the will of a majority imposed on a vigorous and determined minority, find the same obstacle in the local jury that formerly confronted kings and ministers." Pound comments that the law as written, and invoked by prosecutors, "demands conviction of persons whom local or even general opinion does not desire to punish," and adds that "the law is often too mechanical at a point requiring nicety of adjustment."

33. (Pub. Little, Brown 1966). The study of the American jury system, undertaken at the University of Chicago Law School, is a composite analysis of 3576 criminal jury trials, with particular focus on the 1063 instances where the judge reported that he disagreed with the jury verdict, and why. Half these cases present an apparent difference between judge and jury on "sentiments on the law."

*Reflective opinions upholding the necessity for the jury as a protection against arbitrary action, such as prosecutorial abuse of power, stress fundamental features like the jury "common sense judgment" and assurance of "community participation in the determination of guilt or innocence."* [34] *Human fraility*

The study supports in depth the conclusion that the jury is likely to call on its prerogative of lenity and equity, contrary to the judge's instruction, when the case is one where it can empathize with the defendant, feeling either that the jurors might well have been or come to be in the same position, or that in the large the defendant's conduct is not so contrary to general conduct standards as to be condemned as criminally deviate conduct. From a study teeming with illustrations, the following are cited as examples.

The authors broadly discern that "in cases having a de minimis cast or a note of contributory fault or provocation * * * the jury will exercise its de facto powers to write these equities into the criminal law" (p. 285) and "an impatience with the nicety of the law's boundaries hedging the privilege of self-defense" (p. 241). (E. g., acquittal for retaliation following assaults, or even harassment and provocation, without present danger; for violence erupting after domestic strife, or unfaithfulness of spouse; for fraud of a victim still the seller's friend; for statutory rape of a girl unchaste; for sale of liquor to a minor who is a member of the armed forces).

Perhaps most relevant is ch. 19 on Unpopular Laws, p. 286 et seq. Though the authors discerned no law prompting a jury revolt comparable to the historic acquittals on charges of violation of seditious libel or fugitive slave laws, or even Prohibition, the data indicate that the historic role of the jury as a bulwark against official tyranny is "dimly evident in its contemporary role as a moderate corrective against undue prosecutions for gambling, game and liquor violations and, to some extent, drunken driving" (p. 296), the jury's traditional hostility to sumptuary legislation being "keyed to its perception that . . . widespread violation is tolerated" so that prosecution of a particular defendant is contrary to the principle of evenhanded justice (p. 287). And so in some counties "people generally do not like the game law" (p. 288). In counties where jurors play the numbers they acquit broadly in gambling cases (p. 289) etc. When the jurors "feel the same thing could happen to them," they will acquit even of negligent manslaughter charges, as in running a red light, though there are more convictions in cases involving extreme speed. (Ch. 24).

34. See Duncan v. Louisiana, 391 U.S. 145, 156, 88 S.Ct. 1444, 1451, 20 L.Ed.2d 491 (1968) :

Providing an accused with the right to be tried by a jury of his peers gave him an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge. If the defendant preferred the common-sense judgment of a jury to the more tutored but perhaps less sympathetic reaction of the single judge, he was to have it. Beyond this, the jury trial provisions in the Federal and State Constitutions reflect a fundamental decision about the exercise of official power—a reluctance to entrust plenary powers over the life and liberty of the citizen to one judge or to a group of judges. Fear of unchecked power, so typical of our State and Federal Governments in other respects, found expression in the criminal law in this insistence upon community participation in the determination of guilt or innocence.

Williams v. Florida, 399 U.S. 78, 100, 90 S.Ct. 1893, 1906, 26 L.Ed.2d 446 (1970) :

"[T]he essential feature of a jury obviously lies in the interposition between the accused and his accuser of the commonsense judgment of a group of laymen, and in the community participation and shared responsibility that results from that group's determination of guilt or innocence."

See Judge Learned Hand in United States ex rel. McCann v. Adams, 126 F. 2d 774, 775–776 (2d Cir. 1942) :

The institution of trial by jury—especially in criminal cases—has its hold upon public favor chiefly for two reasons. The individual can forfeit his liberty—to say nothing of his life—only at the hands of those who, unlike any official, are in no wise accountable, directly or indirectly, for what they do, and who at once separate and melt anonymously in the community from which they came. Moreover, since if they acquit their verdict is final, no one is likely to suffer of whose conduct they do not morally disapprove; and this introduces a slack into the enforcement of law, tempering its rigor by the mollifying influence of current ethical conventions.

being what it is, a prosecutor disposed by unworthy motives could likely establish some basis in fact for bringing charges against anyone he wants to book, but the jury system operates in fact, (see note 33) so that the jury will not convict when they empathize with the defendant, as when the offense is one they see themselves as likely to commit, or consider generally acceptable or condonable under the mores of the community.

The existence of an unreviewable and unreversible power in the jury, to acquit in disregard of the instructions on the law given by the trial judge, has for many years co-existed with legal practice and precedent upholding instructions to the jury that they are required to follow the instructions of the court on all matters of law. There were different soundings in colonial days and the early days of our Republic. We are aware of the number and variety of expressions at that time from respected sources—John Adams; Alexander Hamilton; prominent judges—that jurors had a duty to find a verdict according to their own conscience, though in opposition to the direction of the court; that their power signified a right; that they were judges both of law and of fact in a criminal case, and not bound by the opinion of the court.[35]

The rulings did not run all one way, but rather precipitated "a number of classic exchanges on the freedom and obligations of the criminal jury."[36] This was, indeed, one of the points of clash between the contending forces staking out the direction of the government of the newly established Republic, a direction resolved in political terms by reforming but sustaining the status of the courts, without radical change.[37] As the distrust of judges appointed and removable by the king receded, there came increasing acceptance that under a republic the protection of citizens lay not in recognizing the right of each jury to make its own law, but in following democratic processes for changing the law.

The crucial legal ruling came in United States v. Battiste, 2 Sum. 240, Fed.Cas. No. 14,545 (C.C.D.Mass. 1835). Justice Story's strong opinion supported the conception that the jury's function lay in accepting the law given to it by the court and applying that law to the facts. This considered ruling of an influential jurist won increasing acceptance in the nation. The youthful passion for independence accommodated itself to the reality that the former rebels were now in control of their own destiny, that the practical needs of stability and sound growth outweighed the abstraction of centrifugal philosophy, and that the judges in the courts, were not the colonial appointees projecting royalist patronage and influence but were themselves part and parcel of the nation's intellectual mainstream, subject to the checks of the common law tradition and professional opinion, and capable, in Roscoe Pound's words, of providing "true judicial justice" standing in contrast with the colonial experience.[38]

35. Howe, Juries as Judges of Criminal Law, 52 Harv.L.Rev. 582 (1939).

36. M. R. Kadish and S. H. Kadish, On Justified Rule Departures by Officials, 59 Calif.L.Rev. 905, 914 (1971).

37. A. Ellis, the Jeffersonian Crisis (Oxford Press, 1971) passim, and see Ch. XIII. The articles of impeachment of Justice Chase included charges that he had failed to instruct juries on their power to disregard the judge's instructions. His vigorous defense of his course was in terms like those later developed by Justice Story in United States v. Battiste, see infra. On this, as on other articles, the radical Republicans were defeated. Evans, Report of the Trial of the Hon. Samuel Chase.

38. See IV Pound, Jurisprudence (West Pub. Co. 1959) pp. 8–9.
 [F]ear of arbitrary judicial action . . . was especially strong in the United States because in seventeenth-century England (the time of colonizing America) the criminal law, in the hands of appointees of the crown subject to arbitrary removal, had been found an effective agent of political and religious persecution. . . . Colonial justice was long executive or legislative. There

The tide was turned by *Battiste,* but there were cross-currents. At mid-century the country was still influenced by the precepts of Jacksonian democracy, which spurred demands for direct selection of judges by the people through elections, and distrust of the judge-made common law which enhanced the movement for codification reform. But by the end of the century, even the most prominent state landmarks had been toppled;[39] and the Supreme Court settled the matter for the Federal courts in Sparf v. United States, 156 U.S. 51, 102, 15 S.Ct. 273, 39 L.Ed. 343 (1895) after exhaustive review in both majority and dissenting opinions. The jury's role was respected as significant and wholesome, but it was not to be given instructions that articulated a right to do whatever it willed. The old rule survives today only as a singular relic.[40]

The breadth of the continuing prerogative of the jury, however, perseveres, as appears from the rulings permitting inconsistent verdicts. These reflect, in the words of Justice Holmes, an acknowledgment that "the jury has the power to bring in a verdict in the teeth of both law and facts,"[41] or as Judge Learned Hand said: "We interpret the acquittal as no more than their assumption of a power which they had no right to exercise, but to which they were disposed through lenity."[42]

Since the jury's prerogative of lenity, again in Learned Hand's words (*supra,* note 34) introduces a "slack into the enforcement of law, tempering its rigor by the mollifying influence of current ethical conventions," it is only just, say appellants, that the jurors be so told. It is unjust to withhold information on the jury power of "nullification," since conscientious jurors may come, ironically, to abide by their oath as jurors to render verdicts offensive to their individual conscience, to defer to an assumption of necessity that is contrary to reality.

This so-called right of jury nullification is put forward in the name of liberty and democracy, but its explicit avowal risks the ultimate logic of anarchy. This is the concern voiced by Judge Sobeloff in United States v. Moylan, 417 F.2d 1002, 1009 (4th Cir. 1969), cert. denied, 397 U.S. 910, 90 S.Ct. 908, 25 L.Ed.2d 91 (1970):

> To encourage individuals to make their own determinations as to which laws they will obey and which they

had been but little experience of true judicial justice with the checks upon judicial action which the common law tradition and pressure of professional opinion provided.

39. See *e. g.,* State v. Burpee, 65 Vt. 1, 34–35, 25 A. 964, 974 (1892), overruling State v. Croteau, 23 Vt. 14 (1849). In State v. Wilkinson, 2 Vt. 480, 531–532 (1829), the court had laid down that although the principle that the jury is to determine the law in criminal cases represents a departure from "logical symmetry," it is a safeguard against tyranny in the law, and one of the law's "great landmarks" for all who view "liberty and law as almost synonymous."

40. Wyley v. Warden, 372 F.2d 742 (4th Cir. 1967), cert. denied, 389 U.S. 863, 88 S.Ct. 121, 19 L.Ed.2d 131 (1967). In holding the provision of the Maryland Constitution consistent with the Federal Constitution, Judge Sobeloff noted that "a practice may be deemed unwise, yet not be unconstitutional." He referred to the

"potent and persuasive arguments . . . leveled against the wisdom of the Maryland practice," and the various jurists' analyses condemning it as "archaic, outmoded and atrocious," "unique and indefensible," an "antique constitutional thorn" in "the flesh of Maryland's body of Criminal Law."

In Maryland the juries must be told the judge's instructions on the law are only "advisory". In Indiana, a similar constitutional provision was attenuated by a decision that a trial court in a criminal case "is not required to neutralize the effect of its instructions by telling the jury that they are at liberty to disregard them, and to decide the law for themselves." Bridgewater v. State, 153 Ind. 560, 566, 55 N.E. 737, 739 (1889).

41. Horning v. District of Columbia, 254 U.S. 135, 138, 41 S.Ct. 53, 54, 65 L.Ed. 185 (1920) (jury power to render illogical and inconsistent verdicts).

42. Steckler v. United States, 7 F.2d 59, 60 (2d Cir. 1920).

will permit themselves as a matter of conscience to disobey is to invite chaos. No legal system could long survive if it gave every individual the option of disregarding with impunity any law which by his personal standard was judged morally untenable. Toleration of such conduct would not be democratic, as appellants claim, but inevitably anarchic.

·The statement that avowal of the jury's prerogative runs the risk of anarchy, represents, in all likelihood, the habit of thought of philosophy and logic, rather than the prediction of the social scientist. But if the statement contains an element of hyperbole, the existence of risk and danger, of significant magnitude, cannot be gainsaid. In contrast, the advocates of jury "nullification" apparently assume that the articulation of the jury's power will not extend its use or extent, or will not do so significantly or obnoxiously. Can this assumption fairly be made? We know that a posted limit of 60 m.p.h. produces factual speeds 10 or even 15 miles greater, with an understanding all around that some "tolerance" is acceptable to the authorities, assuming conditions warrant. But can it be supposed that the speeds would stay substantially the same if the speed limit were put: Drive as fast as you think appropriate, without the posted limit as an anchor, a point of departure?

Our jury system is a resultant of many vectors, some explicit, and some rooted in tradition, continuity and general understanding without express formulation. A constitution may be meaningful though it is unwritten, as the British have proved for 900 years.

The jury system has worked out reasonably well overall, providing "play in the joints" that imparts flexibility and avoid undue rigidity. An equilibrium has evolved—an often marvelous balance—with the jury acting as a "safety valve" for exceptional cases, without being a wildcat or runaway institution. There is reason to believe that the simultaneous achievement of modest jury equity and avoidance of intolerable caprice depends on formal instructions that do not expressly delineate a jury charter to carve out its own rules of law.[43] We have taken due and wry note that those whose writings[44] acclaim and invoke Roscoe Pound's 1910 recognition of the value of the jury as safety valve, omit mention of the fact that in the same article he referred to "the extreme decentralization that allows a local jury or even a local prosecutor to hold up instead of uphold the law of the state" as one of the conditions that "too often result in a legal paralysis of legal administration,"[45] that his writings of that period are expressly concerned with the evils of the "extravagant powers" of juries,[46] and that in 1931 he joined the other distin-

43. See Kalven and Zeisel, op cit. *supra* note 33, p. 427.

44. *E. g.*, Scheflin, Jury Nullification: The Right to Say No, 45 So.Calif.L.Rev. 168, 182 (1972).

45. See R. Pound, Law in Books and Law in Action, cited *supra* note 32, at p. 35: The clash of departments or even of officials, so characteristic of our polity, the extreme decentralization that allows a local jury or even a local prosecutor to ·hold up instead of uphold the law of the state, the elaborate machinery of check, balance and subdivision which the Puritan jealousy of the magistrate has fixed in our institutions, too often

result in a legal paralysis of legal administration.

46. See Pound, The Causes of Popular Dissatisfaction with the Administration of Justice, 29 ABA Rpts. 395, 401 (1906). He discourses on the necessarily mechanical operation of legal rules, as a penalty of uniformity; the inevitable difference in rate of progress between law and public opinion; the invalidity of the popular assumption that anyone is competent for the task of administration of justice ("The public seldom realizes how much it is interested in maintaining the highest scientific standard in the administration of justice.")

guished members of the Wickersham Commission in this comment:[47]

> In a number of jurisdictions juries are made judges of the law in criminal cases, thus inviting them to dispense with the rules of law instead of finding the facts. The juror is made judge of the law not to ascertain what it is, but to judge of its conformity to his personal ideals and ascertain its validity on that basis. . . . It is significant that there is most satisfaction with criminal juries in those jurisdictions which have interfered least with the conception of a trial of the facts unburdened with further responsibility and instructed as to the law and advised as to the facts by the judge.

The way the jury operates may be radically altered if there is alteration in the way it is told to operate. The jury knows well enough that its prerogative is not limited to the choices articulated in the formal instructions of the court.[48] The jury gets its understanding as to the arrangements in the legal system from more than one voice. There is the formal communication from the judge. There is the informal communication from the total culture—literature (novel, drama, film, and television); current comment (newspapers, magazines and television); conversation; and, of course, history and tradition. The totality of input generally convey adequately enough the idea of prerogative, of freedom in an occasional case to depart from what the judge says. Even indicators that would on their face seem too weak to notice—like the fact that the judge tells the jury it must acquit (in case of reasonable doubt) but

never tells the jury in so many words that it must convict—are a meaningful part of the jury's total input. Law is a system, and it is also a language, with secondary meanings that may be unrecorded yet are part of its life.

When the legal system relegates the information of the jury's prerogative to an essentially informal input, it is not being duplicitous, chargeable with chicane and intent to deceive. The limitation to informal input is, rather a governor to avoid excess: the prerogative is reserved for the exceptional case, and the judge's instruction is retained as a generally effective constraint. We "recognize a constraint as obligatory upon us when we require not merely reason to defend our rule departures, but damn good reason."[49] The practicalities of men, machinery and rules point up the danger of articulating discretion to depart from a rule, that the breach will be more often and casually invoked. We cannot gainsay that occasionally jurors uninstructed as to the prerogative may feel themselves compelled to the point of rigidity.[50] The danger of the excess rigidity that may now occasionally exist is not as great as the danger of removing the boundaries of constraint provided by the announced rules.

We should also note the inter-relation of the unanimity requirement for petit juries, which was applicable to this trial, and is still the general rule though no longer constitutionally required for state courts.[51] This is an additional reason—a material consideration, though neither a necessary nor sufficient condition—to brake the wheels of those who would tell the petit jurors they are to determine the rules of law, either directly or

**47.** National Commission on Law Observance and Enforcement (1931), Report No. 8 (Criminal Procedure) pp. 26–27. See also R. Pound, Jurisprudence, quoted *supra* note 38.

**48.** See Judge Rifkind's comments in Follow-Up/The Jury, Center Magazine, 64–65 (July, 1970).

**49.** Kadish and Kadish, *supra*, note 36, 59 Calif.L.Rev. at 926.

**50.** Sax, Conscience and Anarchy: The Prosecution of War Resistors, 57 Yale Review 481, 490 (1968).

**51.** See Apodaca v. Oregon, 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972); Johnson v. Louisiana, 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972).

by telling them they are free to disregard the judge's statement of the rules. The democratic principle would not be furthered, as proponents of jury nullification claim, it would be disserved by investing in a jury that must be unanimous the function not merely of determining facts, hard enough for like-minded resolution, but of determining the rules of law.

Rules of law or justice involve choice of values and ordering of objectives for which unanimity is unlikely in any society, or group representing the society, especially a society as diverse in cultures and interests as ours. To seek unity out of diversity, under the national motto, there must be a procedure for decision by vote of a majority or prescribed plurality—in accordance with democratic philosophy. To assign the role of mini-legislature to the various petit juries, who must hang if not unanimous, exposes criminal law and administration to paralysis, and to a deadlock that betrays rather than furthers the assumptions of viable democracy.

Moreover, to compel a juror involuntarily assigned to jury duty to assume the burdens of mini-legislator or judge, as is implicit in the doctrine of nullification, is to put untoward strains on the jury system. It is one thing for a juror to know that the law condemns, but he has a factual power of lenity. To tell him expressly of a nullification prerogative, however, is to inform him, in effect, that it is he who fashions the rule that condemns. That is an overwhelming responsibility, an extreme burden for the jurors' psyche. And it is not inappropriate to add that a juror called upon for an involuntary public service is entitled to the protection, when he takes action that he knows is right, but also knows is unpopular, either in the community at large or in his own particular grouping, that he can fairly put it to friends and neighbors that he was merely following the instructions of the court.

In the last analysis, our rejection of the request for jury nullification doctrine is a recognition that there are times when logic is not the only or even best guide to sound conduct of government. For machines, one can indulge the person who likes to tinker in pursuit of fine tuning. When men and judicial machinery are involved, one must attend to the many and complex mechanisms and reasons that lead men to change their conduct—when they know they are being studied; when they are told of the consequences of their conduct; and when conduct exercised with restraint as an unwritten exception is expressly presented as a legitimate option.

■■■■■ What makes for health as an occasional medicine would be disastrous as a daily diet. The fact that there is widespread existence of the jury's prerogative, and approval of its existence as a "necessary counter to case-hardened judges and arbitrary prosecutors,"[52] does not establish as an imperative that the jury must be informed by the judge of that power. On the contrary, it is pragmatically useful to structure instructions in such wise that the jury must feel strongly about the values involved in the case, so strongly that it must itself identify the case as establishing a call of high conscience,[53] and

---

52. See Justice Fortas's comments in Follow-Up/The Jury, op. cit. supra, note 48, at 61.

53. Compare the London Juror's Petition of September 6, 1831, protesting against undue use of capital punishment. "That in the present state of the law, juries feel extremely reluctant to convict where the penal consequences of the offence excite a conscientious· horror on their minds, lest the rigorous performance of their duty as jurors should make them accessory to judicial murder. Hence in Courts of Justice, a most unnecessary and painful struggle is occasioned, by the conflict of the feelings of a *just* humanity with the sense of the obligation of an oath." See Appendix 4, at p. 731, of L. Radzinowicz, The Movement for Reform, 1750–1833, A History of English Criminal Law (Macmillan 1948).

But jurors sufficiently beset by the strain respond on their own to a call of

must independently initiate and undertake an act in contravention of the established instructions. This requirement of independent jury conception confines the happening of the lawless jury to the occasional instance that does not violate, and viewed as an exception may even enhance, the over-all normative effect of the rule of law. An explicit instruction to a jury conveys an implied approval that runs the risk of degrading the legal structure requisite for true freedom, for an ordered liberty that protects against anarchy as well as tyranny.

Finally, we are aware that the denial of defendants' request for a nullification instruction will be considered by them to negative some, or perhaps most, of the value of the right of *pro se* representation which we have recognized. This point could be answered in terms of logic: The right of self-representation is given for reasons recognized by the law, and cannot be a springboard to establish the validity of other advantages or conditions that lie in its tactical wake. Thus, a defendant's ability to present his demeanor and often even a kind of testimony, without exposure to impeachment or cross-examination, may be a tactical consequence of *pro se* representation, and even a moving cause of its invocation, but this is not to say it is an objective of the law. But defendants' position merits a more spacious answer, that lies outside the domain of formal logic. It is this. The jury system provides flexibility for the consideration of interests of justice outside the formal rules of law. This embraces whatever extra the defendant conveys by personal representation, whether through demeanor or sincerity of justification. But it is subject to the overriding consideration that what is tolerable or even desirable as an informal, self-initiated exception, harbors grave dangers to the system if it is opened to expansion and intensification through incorporation in the judge's instruction.

## IV. *The Jury Instructions*

Finally, defendants assert that one segment of the charge to the jury, set forth in the margin,[54] was coercive,

---

higher conscience they believe strong and clear. Indeed in 1830 the bankers of England formally petitioned the Commons to abolish capital punishment for forgery because this prevented convictions "and thus endangers the property which it is intended to protect." Radzinowicz, op. cit. *supra*, Appendix 3, p. 730. (The Petition of Bankers from 214 Cities and Towns, May 24, 1830)

Blackstone refers to the "pious perjury" under which jurors understated the value of articles stolen in order to avoid the capital charge. 4 Comm. 239. Professor Radzinowicz (op. cit. supra, at ch. 3, and 4) develops this and other lenity practices of grand and petit juries in the 18th and 19th centuries, and even includes (p. 94, fn. 49) an instance wherein Lord Mansfield—a strict judge—advised a jury to find a gold trinket of less value than 40 shillings. When the prosecutor indignantly exclaimed that its fashion alone was worth double that, Lord Mansfield observed, "God forbid, gentlemen, we should hang a man for fashion's sake."

54. Finally, ladies and gentlemen, you are not trying the Vietnam War. The Vietnam War is not an issue in this case.

You are not trying ideas. You are not trying the United States. You are not trying society. You are not trying any individual, any corporation, large or small. For there can be no freedom, no equal opportunity in an environment of criminal behavior. No nation should tolerate disregard of the law.

As Mr. Justice Goldberg said in the recent Supreme Court case of Cox against Louisiana [379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487]:

The constitutional guarantee of liberty implies the existence of an organized society maintaining public order without which liberty itself would be lost.

And he went on further to say in that case:

We also reaffirm the repeated decisions of this Court that there is no place for violence in a democratic society dedicated to liberty under law, and that the right of peaceful protest does not mean that everyone with opinions or beliefs to express may do so at any time and at any place. There is a proper time and place for even the most peaceful protest and a plain duty and

tantamount to a directed verdict of guilty, and outside the proper scope of a judicial instruction.

■■ For the most part, defendants' real complaint seems to be that the court stated the law applicable to the case. There is no contention—apart from the jury nullification claim, which we have rejected—that the charge was inaccurate as a statement of the applicable law. If a judge is to instruct the jury on the ultimate facts that are material under the law, he may properly advise the jury of what matters brought forward by defendants are not material under the applicable rule of law—as surely as he may charge that voluntary intoxication is no defense to a charge of second degree murder. Since it is the essence of the judicial function to declare the applicable law, it follows that the mere declaration of the law cannot be held outside the judicial function. This is tautological, but it is often the part of wisdom to be able to recognize which propositions are true tautologies. The

jury were not told they must bring in a guilty verdict nor was there the kind of language or conduct, going beyond a declaration of the applicable law, that has in other cases[55] been held coercive, and an imroper departure from the role of the judge.

\* \* \*

The judgment must be reversed, for the reasons stated in part II of this opinion, and the case remanded for new trial, if the Government be so advised, in accordance with parts III and IV.

So ordered.

BAZELON, Chief Judge, concurring in part and dissenting in part:

I concur in the Court's discussion of the statutory right of self-representation in criminal cases. In view of our holding that the statutory right is "unqualified," our decision need not rest on the asserted constitutional right to proceed *pro se*. I emphasize, however, that my concurrence reflects no retreat from the position I expressed thirteen years

---

responsibility on the part of all citizens to obey all valid laws and regulations.

If you find that the Government has proven beyond a reasonable doubt that one or more of the defendants committed each of the elements comprising the crimes of second degree burglary and/or malicious destruction of property, then I must instruct you further that the law does not recognize as a defense to either of these charges that the defendants were motivated to commit their acts by sincere political, religious or moral convictions or in obedience to some higher law.

Individuals who believe that the Vietnam War is illegal or immoral or that certain activities of the Dow Company are undesirable have the right under our system of government to express their views or to protest these events by any lawful means, such as by peaceful picketing or parading. But the Constitution of the United States does not protect as a form of symbolic speech the destruction of private property and the violation of valid laws designed to protect society.

The defendants may have been motivated by the highest moral principles, and they may have been sincerely and passionately inspired. But such motives do not confer immunity from prosecution or conviction for the violation of a valid law, and as such the motives of the de-

fendants are not controlling in the case which is before you for decision.

Therefore, if you find beyond a reasonable doubt that one or more of the defendants had the required intent to commit one or more of the offenses with which they are charged, then it is no defense that he or she also had one or more other intentions, reasons, purposes or motives, such as to protest against the Vietnam War or the activities of the Dow Company; nor is it a defense that he or she acted from sincere, religious motives, or that he or she believed that his or her intent was justified by some higher law. (Tr. 825–827.)

55. Starr v. United States, 153 U.S. 614, 626–628, 14 S.Ct. 919, 38 L.Ed. 841 (1894) (court advocated defendant's guilt to the jury in a long address); Quercia v. United States, 289 U.S. 466, 53 S.Ct. 698, 77 L.Ed. 1321 (1933) (judge expressed opinion that defendant was a liar); Hardy v. United States, 118 U.S. App.D.C. 253, 335 F.2d 288 (1964) (judge stated government's case as affirmative facts); Blunt v. United States, 100 U.S.App.D.C. 266, 244 F.2d 355 (1957) (judge stated matter in issue as a fact, and in other respects advocated the prosecution's position).

ago in Brown v. United States, 105 U.S. App.D.C. 77, 84, 264 F.2d 363, 370 (1959) (en banc) (dissenting opinion). I believed then, and I believe today, that the sixth amendment guarantees a defendant the right to act on his own behalf in resisting a criminal prosecution.

My disagreement with the Court concerns the issue of jury nullification. As the Court's opinion clearly acknowledges, there can be no doubt that the jury has "an unreviewable and unreversible power * * * to acquit in disregard of the instructions on the law given by the trial judge * * *." Majority opinion at 1132. More important, the Court apparently concedes—although in somewhat grudging terms—that the power of nullification is a "necessary counter to case-hardened judges and arbitrary prosecutors,"[1] and that exercise of the power may, in at least some instances, "enhance, the over-all normative effect of the rule of law." Id. at 1137. We could not withhold that concession without scoffing at the rationale that underlies the right to jury trial in criminal cases,[2] and belittling some of the most legendary episodes in our political and jurisprudential history.[3]

The sticking point, however, is whether or not the jury should be told of its power to nullify the law in a particular case. Here, the trial judge not only denied a requested instruction on nullification, but also barred defense counsel from raising the issue in argument before the jury. The majority affirms that ruling. I see no justification for, and considerable harm in, this deliberate lack of candor.

At trial, the defendants made no effort to deny that they had committed the acts charged. Their defense was designed to persuade the jury that it would be unconscionable to convict them of violating a statute whose general validity and applicability they did not challenge. An instruction on nullification—or at least some argument to the jury on that issue—was, therefore, the linchpin of the defense.

At the outset it is important to recognize that the trial judge was not simply neutral on the question of nullification. His instruction, set out in part in the margin,[4] emphatically denied the existence of a "legal defense" based on "sincere religious motives" or a belief that

1. Majority opinion at 1136 and n. 52, *quoting* Fortas, Follow-Up/The Jury, Center Magazine 61 (July, 1970).

2. *See* Williams v. Florida, 399 U.S. 78, 100, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970); Duncan v. Louisiana, 391 U.S. 145, 155–156, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968); United States v. Spock, 416 F.2d 165, 180–182 (1st Cir. 1969); United States v. Bennett, 148 U.S.App. D.C. 364, at 368, 460 F.2d 872, at 876 (1972); United States v. Eichberg, 142 U.S.App.D.C. 110, 113, 439 F.2d 620, 623 (1971) (Bazelon, C. J., concurring); Scheflin, Jury Nullification: The Right to Say No, 45 S.Cal.L.Rev. 168, 187–88 (1972).

In *Duncan* the Supreme Court stated: A right to jury trial is granted to criminal defendants in order to prevent oppression by the Government. Those who wrote our constitutions knew from history and experience that it was necessary to protect against unfounded criminal charges brought to eliminate enemies and against judges too responsive to the voice of higher author-

ity. * * * Providing an accused with the right to be tried by a jury of his peers gave him an inestimable safeguard against the corrupt or overzealous prosecutor and against the complaint, biased, or eccentric judge. * * * Fear of unchecked power, so typical of our State and Federal Governments in other respects, found expression in the criminal law in this insistence upon community participation in the determination of guilt or innocence. 391 U.S. at 155–156, 88 S.Ct. at 1451.

3. *See generally* Scheflin, *supra*, note 2; H. Kalven & H. Zeisel, The American Jury 310–11 (1966); J. Alexander, A Brief Narration of the Case and Trial of John Peter Zenger (1963); *cf.* Duncan v. Louisiana, 391 U.S. 145, 155–156, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968).

4. Transcript at 825–27: Finally, ladies and gentlemen, you are not trying the Vietnam war. The Vietnam war is not an issue in this case. You are not trying ideas. You are not trying the United States. You

action was justified by "some higher law." That charge was not directly inconsistent with the theory of jury nullification. Nullification is not a "defense" recognized by law, but rather a mechanism that permits a jury, as community conscience,[5] to disregard the strict requirements of law where it finds that those requirements cannot justly be applied in a particular case. Yet the impact of the judge's instruction, whatever his intention, was almost surely to discourage the jury from measuring the defendants' action against community concepts of blameworthiness.

Thus, we are left with a doctrine that may "enhance the over-all normative effect of the rule of law," but, at the same time, one that must not only be concealed from the jury, but also effectively condemned in the jury's presence. Plainly, the justification for this sleight-of-hand lies in a fear that an occasionally noble doctrine will, if acknowledged, often be put to ignoble and abusive purposes—or, to borrow the Court's phrase, will "run

---

are not trying society. You are not trying any individual, any corporation large or small. For there can be no freedom, no equal opportunity in an environment of criminal behavior. No nation should tolerate disregard of the law.

As Mr. Justice Goldberg said in the recent Supreme Court case of Cox v. Louisiana: "The constitutional guarantee of liberty impiles the existence of an organized society maintaining public order without which liberty would be lost."

\* \* \* \* \*

We also reaffirm the repeated decisions of this court that there is no place for violence in a democratic society dedicated to liberty under law, and that the right of peaceful protest does not mean that everyone with opinions or beliefs to express may do so at any time and at any place. There is a proper time and place for even the most peaceful protest and a plain duty and responsibility on the part of all citizens to obey all valid laws and regulations.

If you find that the Government has proven beyond a reasonable doubt that one or more of the defendants committed each of the elements comprising the crimes of second degree burglary and/or malicious destruction of property, then I must instruct you further that the law does not recognize as a defense to either of these charges that the defendants were motivated to commit their acts by sincere political, religious or moral convictions or in obedience to some higher law.

Individuals who believe that the Vietnam War is illegal or immoral or that certain activities of the Dow Company are undesirable have the right under our system of government to express their views or to protest these events by any

lawful means, such as by peaceful picketing or parading. But the Constitution of the United States does not protect as a form of symbolic speech the destruction of private property and the violation of valid laws designed to protect society.

The defendants may have been motivated by the highest moral principles, and they may have been sincerely and passionately inspired. But such motives do not confer immunity from prosecution or conviction for the violation of a valid law, and as such the motives of the defendants are not controlling in the case which is before you for decision.

Therefore, if you find beyond a reasonable doubt that one or more of the defendants had the required intent to commit one or more of the offenses with which they are charged, then it is no defense that he or she also had one or more other intentions, reasons, purposes, or motives, such as to protest against the Vietnam War or the activities of the Dow Company. Nor is it a defense that he or she acted from sincere, religious motives, or that he or she believed that his or her intent was justified by some higher law.

5. I do not contend that the jury is the exclusive spokesman of the community conscience. When the legislature enacts a criminal prohibition it too speaks on behalf of that conscience. But I cannot assume that every criminal statute enacts a rule of liability without fault. The legislative function is to define and proscribe certain behavior that is generally considered blameworthy. That leaves to the jury the responsibility of deciding whether special factors present in the particular case compel the conclusion that the defendant's conduct was not blameworthy.

the risk of anarchy." Majority opinion at 1134. A breakdown of the legal order is not a result I would knowingly encourage or enjoy. But the question cannot be resolved, at least at this stage of the argument, by asking if we are for or against anarchy, or if we are willing to tolerate a little less law and order so that we can permit a little more jury nullification. No matter how horrible the effect feared by the Court, the validity of its reasoning depends on the existence of a demonstrable connection between the alleged cause (a jury nullification instruction or argument to the jury on that issue) and that effect. I am unable to see a connection.

To be sure, there are abusive purposes, discussed below, to which the doctrine might be put. The Court assumes that these abuses are most likely to occur if the doctrine is formally described to the jury by argument or instruction. That assumption, it should be clear, does not rest on any proposition of logic. It is nothing more or less than a prediction of how jurors will react to the judge's instruction or argument by counsel. And since we have no empirical data to measure the validity of the prediction, we must rely on our own rough judgments of its plausibility.

The Court reasons that a jury uninformed of its power to nullify will invoke that power only where it "feel[s] strongly about the values involved in the case, so strongly that it [will] itself identify the case as establishing a call of high conscience * * *." Majority opinion at 1136. In other words, the spontaneous and unsolicited act of nullification is thought less likely, on the whole, to reflect bias and a perverse sense of values than the act of nullification carried out by a jury carefully instructed on its power and responsibility.

It seems substantially more plausible to me to assume that the very opposite is true. The juror motivated by prejudice seems to me more likely to make spontaneous use of the power to nullify, and more likely to disregard the judge's exposition of the normally controlling legal standards. The conscientious juror, who could make a careful effort to consider the blameworthiness of the defendant's action in light of prevailing community values, is the one most likely to obey the judge's admonition that the jury enforce strict principles of law.

Moreover, if it were true that nullification which arises out of ignorance is in some sense more worthy than nullification which arises out of knowledge, the Court would have to go much further. For under the Court's assumption, the harm does not arise because a jury is *told* of its power to disregard the law, but because it *knows* of its power. Logically construed, the Court's opinion would seem to require the disqualification at voir dire of any prospective juror who admitted to knowledge of the doctrine. By excluding jurors with knowledge of the doctrine the Court could insure that its invocation would be spontaneous. And yet, far from requiring the exclusion of jurors who are aware of the power, the Court takes comfort in the fact that informal communication to the jury "generally convey[s] adequately enough the idea of prerogative, of freedom in an occasional case to depart from what the judge says." Majority opinion at 1135. One cannot, it seems to me, have the argument both ways. If, as the Court appears to concede, awareness is preferable to ignorance, then I simply do not understand the justification for relying on a haphazard process of informal communication whose effectiveness is likely to depend, to a large extent, on whether or not any of the jurors are so well-educated and astute that they are able to receive the message. If the jury should know of its power to disregard the law, then the power should be explicitly described by instruction of the court or argument of counsel.

My own view rests on the premise that nullification can and should serve an important function in the criminal process. I do not see it as a doctrine that exists only because we lack the power to punish

jurors who refuse to enforce the law or to re-prosecute a defendant whose acquittal cannot be justified in the strict terms of law. The doctrine permits the jury to bring to bear on the criminal process a sense of fairness and particularized justice. The drafters of legal rules cannot anticipate and take account of every case where a defendant's conduct is "unlawful" but not blameworthy, any more than they can draw a bold line to mark the boundary between an accident and negligence. It is the jury—as spokesman for the community's sense of values—that must explore that subtle and elusive boundary.

Admittedly, the concept of blameworthiness does not often receive explicit recognition in the criminal process. But it comes very close to breaking through the surface in cases where the responsibility defense is raised, *see* United States v. Brawner, 153 U.S.App.D.C. 1, at 62, 471 F.2d 969, at 1030 (1972) (en banc), (separate opinion); United States v. Bennett, 148 U.S.App.D.C. 364, 368–370, 460 F.2d 872, 876–878 (1972); United States v. Eichberg, 142 U.S.App. D.C. 110, 113, 439 F.2d 620, 623 (1971) (concurring opinion), and it is implicit in every case where criminal sanctions are imposed. More than twenty-five years ago this Court recognized that

"[o]ur collective conscience does not allow punishment where it cannot impose blame." [6] And the Supreme Court, in a well-known opinion by Justice Jackson, has pointed out that

> courts of various jurisdictions, and for the purposes of different offenses, have devised working formulae, if not scientific ones, for the instruction of juries around such terms as "felonious intent," "criminal intent," "malice aforethought," "guilty knowledge," "fraudulent intent," "wilfulness," "scienter," to denote guilty knowledge, or *"mens rea,"* to signify an evil purpose or mental culpability. By use or combination of these various tokens, they have sought to *protect those who were not blameworthy in mind from conviction of infamous common-law crimes.*[7]

The very essence of the jury's function is its role as spokesman for the community conscience in determining whether or not blame can be imposed.[8]

I do not see any reason to assume that jurors will make rampantly abusive use of their power. Trust in the jury is, after all, one of the cornerstones of our entire criminal jurisprudence, and if that trust is without foundation we must re-examine a great deal more than just the nullification doctrine. Nevertheless,

---

6. Holloway v. United States, 80 U.S.App. D.C. 3, 4–5, 148 F.2d 665, 666–667 (1945), quoted in Durham v. United States, 94 U.S.App.D.C. 228, 242, 214 F.2d 862, 876 (1954).

7. Morissette v. United States, 342 U.S. 246, 252, 72 S.Ct. 240, 96 L.Ed. 288 (1952) (emphasis supplied). *See also* United States ex rel. McCann v. Adams, 126 F.2d 774, 775–776 (2d Cir. 1942) (L. Hand, J.), rev'd on other grounds, 317 U.S. 269, 63 S.Ct. 236, 87 L.Ed. 268 (1962); Hart, The Aims of the Criminal Law, 23 Law & Contemp.Probs. 401 (1958).

 The nullification doctrine derives from the same moral principles as the *mens rea* or responsibility defense. But in view of my conclusion that the trial judge should have granted a nullification instruction, it is unnecessary for me to decide whether reversal would be required on the theory that the instruction that was offered effectively directed the jury to make a finding that the defendant possessed the necessary *mens rea.* Compare majority opinion at 1137–1138.

8. *See* Williams v. Florida, 399 U.S. 78, 100, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970); Duncan v. Louisiana, 391 U.S. 145, 155–156, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968); United States ex rel. McCann v. Adams, *supra; cf.* A. Goldstein, The Insanity Defense 91 (1967):

 [The insanity defense] is a normative standard applied to conflicting clusters of fact and opinion by a jury, an institution which is the traditional embodiment of community morality and, therefore, well suited to determining whether a particular defendant, and his act, warrant condemnation rather than compassion.

 *See also* Robinson v. Diamond Housing Corp., 150 U.S.App.D.C. 17, 29, 463 F.2d 853, 865 (1972).

some abuse can be anticipated. If a jury refuses to apply strictly the controlling principles of law, it may—in conflict with values shared by the larger community—convict a defendant because of prejudice against him, or acquit a defendant because of sympathy for him and prejudice against his victim. Our fear of unjust conviction is plainly understandable. But it is hard for me to see how a nullification instruction could enhance the likelihood of that result. The instruction would speak in terms of acquittal, not conviction, and it would provide no comfort to a juror determined to convict a defendant in defiance of the law or the facts of the case. Indeed, unless the jurors *ignored* the nullification instruction they could not convict on the grounds of prejudice alone. Does the judge's recitation of the instruction increase the likelihood that the jury will ignore the limitation that lies at its heart? I hardly think so.

As for the problem of unjust acquittal, it is important to recognize the strong internal check that constrains the jury's willingness to acquit. Where defendants seem dangerous, juries are unlikely to exercise their nullification power, whether or not an explicit instruction is offered. Of course, that check will not prevent the acquittal of a defendant who may be blameworthy and dangerous except in the jaundiced eyes of a jury motivated by a perverse and sectarian sense of values. But whether a nullification instruction would make such acquittals more common is problematical, if not entirely inconceivable. In any case, the real problem in this situation is not the nullification doctrine, but the values and prejudice that prompt the acquittal.[9] And the solution is not to condemn the nullification power, but to spotlight the prejudice and parochial values that underlie the verdict in the hope that public outcry will force a re-examination of those values, and deter their implementation in subsequent cases. Surely nothing is gained by the pretense that the jurors lack the power to nullify, since that pretense deprives them of the opportunity to hear the very instruction that might compel them to confront their responsibility.

One often-cited abuse of the nullification power is the acquittal by bigoted juries of whites who commit crimes (lynching, for example) against blacks.[10] That repellent practice cannot be directly arrested without jeopardizing important constitutional protections—the double jeopardy bar and the jury's power of nullification. But the revulsion and sense of shame fostered by that practice fueled the civil rights movement, which in turn made possible the enactment of major civil rights legislation. That same movement spurred on the revitalization of the equal protection clause and, in particular, the recognition of the right to be tried before a jury selected without bias.[11] The lessons we learned from these abuses helped to create a climate in which such abuses could not so easily thrive.

Moreover, it is not only the abuses of nullification that can inform our understanding of the community's values and standards of blameworthiness. The noble uses of the power—the uses that "enhance the over-all normative effect of the rule of law"—also provide an important input to our evaluation of the substantive standards of the criminal law. The reluctance of juries to hold defendants responsible for unmistakable violations of the prohibition laws told us much about the morality of those laws and about the "criminality" of the conduct they proscribed. And the same can be said of the acquittals returned under the fugitive slave law [12] as well as con-

9. *See* Scheflin, *supra* note 2, at 226 n. 188.

10. *See, e. g.*, Trial and Terror, Newsweek (Nov. 4, 1946), reprinted in Racial Violence in the United States 161–62 (Grimshaw ed. 1969).

11. *See* Carter v. Jury Comm'n, 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970); Turner v. Fouche, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970).

12. *See* Scheflin, *supra* note 2, at 177.

temporary gaming and liquor laws.[13] A doctrine that can provide us with such critical insights should not be driven underground.

On remand the trial judge should grant defendants' request for a nullification instruction. At the very least,[14] I would require the trial court to permit defendants to argue the question before the jury. But it is not at all clear that defendants would prevail even with the aid of an instruction or argument. After all, this case is significantly different from the classic, exalted cases where juries historically invoked the power to nullify. Here, the defendants have no quarrel with the general validity of the law under which they have been charged. They did not simply refuse to obey a government edict that they considered illegal, and whose illegality they expected to demonstrate in a judicial proceeding. Rather, they attempted to protest government action by interfering with others—specifically, the Dow Chemical Company. This is a distinction which could and should be explored in argument before the jury. If revulsion against the war in Southeast Asia has reached a point where a jury would be unwilling to convict a defendant for commission of the acts alleged here, we would be far better advised to ponder the implications of that result than to spend our time devising stratagems which let us pretend that the power of nullification does not even exist.

ADAMS, Circuit Judge:

This case presents several difficult and subtle issues. Their resolution requires a sensitive understanding of human dignity, American legal and political history, and the interrelationship of those factors with the present criminal justice system, for it is this system that ensures that all persons may peacefully pursue their interests without undue interference from others.

Here, the defendants, by interrupting the business of a large chemical company, attempted to publicize their dissenting views regarding the morality of the American involvement in the Vietnam War. It is apparent that the defendants attempted to exploit their criminal trial by using it as a platform for further exposition of their beliefs, and to rely on their moral position as a defense of criminal charges lodged against them. In furtherance of their efforts to transform what would otherwise be an ordinary criminal trial into a "political" fray, defendants wished to represent themselves, to deviate from the usual mode of conducting a criminal trial, and to argue to the jury that although they were in violation of the applicable statutes, they should be acquitted because their actions were morally justified.

The rulings of the district court regarding (a) the defendants' motions to proceed pro se, (b) the defendants' right to have the court charge the jury as to the nullification issue, and (c) the content of the charge as actually given provide the foundation of this appeal.

In addressing these questions, some of which are to a large extent as philosophical as they are legal, the Court of Appeals is at some disadvantage—especially with regard to self representation—in evaluating the district court's action from the cold record, divorced from the climate of the time when the trial took place. We must be mindful that the events in question here—defendants' criminal acts as well as the trial itself—occurred during a period of passionate

13. H. Kalven & H. Zeisel, *supra* note 3, at 296–97. Jury nullification also provides us with crucial information about the morality of the death penalty. *See* McGautha v. California, 402 U.S. 183, 199, 91 S.Ct. 1454, 1463, 28 L.Ed.2d 711 (1971):

In order to meet the problem of jury nullification, legislatures did not try, as before, to refine further the definition of capital homicides. Instead they adopted the method of forthrightly granting juries discretion which they had been exercising in fact.

14. *Compare* Sparf & Hansen v. United States, 156 U.S. 51, 15 S.Ct. 273, 39 L.Ed. 343 (1895).

and at times bitter political dissent. Several so-called "political" trials, including those of Dr. Benjamin Spock, the Catonsville Nine, and the Chicago Seven, occurred prior to this proceeding. In particular, it is significant that this trial closely followed that of the Chicago Seven, a trial wracked with violent disruptions when the defendants there challenged the underlying structure of the criminal justice system as we know it today.

In the context of what was transpiring in the judicial process in 1968 and 1969, the trial judge here was faced with a formidable task. On one hand, he had to preserve the judicial atmosphere vital in criminal proceedings to assure that both the Government and the defendants received a fair trial on the merits. The judge could not help but be aware that as a society we believe that an orderly, adversary trial by jury is a most efficacious means of arriving at the truth of the matters into which the court is inquiring. On the other hand, he had to take account of the asserted rights of the defendants to present themselves as moral persons—possessed with dignity and freedom of spirit, attributes upon which our system of Government was founded and built—as they sought to be acquitted of their crimes. In evaluating whether the trial judge erred, we must be cognizant of the delicate balance he had to strike between ordered tranquility and America's irrepressible desire for liberty. Only if the court unduly weighted the scales against the defendants, either by his application of the facts of this case to the rules governing his actions or by his interpretation of the controlling law, may we reverse the convictions.

The apposite law, in my judgment, is accurately set forth in Judge Leventhal's opinion. Specifically, I concur in his holding that defendants have a statutory right to proceed pro se in a federal criminal trial, and that, in this case, it is not necessary to decide the question in Constitutional terms.[1] I also concur in the conclusion that the right to proceed pro se is waivable, either expressly or constructively, for example, by untimely assertion or by disruptive behavior. However, I disagree with Judge Leventhal's factual conclusion that the defendant's behavior here did not amount to a constructive waiver of the pro se right. Because I do not consider that the trial judge violated this right of the defendants, it is not necessary to decide whether such a violation may nevertheless be considered harmless error.

Since I would not reverse these convictions based on violation of defendants'

1. Defendants argue that the right to proceed pro se is both Constitutional and absolute. But not all Constitutional rights are absolute. Indeed, the right to be represented by counsel may be intelligently and knowingly waived, Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1937), and the right to discharge one attorney for another after the trial has begun is subject to the trial court's discretion, see Evans v. Ockershausen, 69 U.S.App.D.C. 285, 100 F.2d 695 (1938). Other rights, such as the very important right to be present during the trial itself, may be waived by obstreperous conduct. Illinois v. Allen, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). The considerations deemed important in *Allen* apply to a case such as this.

In another case, it may be important to distinguish the source of the right to proceed pro se. If that right is Constitutional in origin, as held in United States v. Plattner, 330 F.2d 271 (2d Cir. 1964), then any violation of that right at all might require a remand for new trial, despite the absence of prejudice. *See id.*, at 273, and the cases cited in footnote 2 therein. On the other hand, if the right is statutory only, then it may be subject to the harmless error doctrine. Similarly, if the right here asserted is enshrined in the Constitution, rather than established by statute, then a much more serious question regarding waiver would be presented.

However, these questions need not be decided in this case because the record here clearly establishes a waiver of the right to proceed pro se, even if such right is deemed Constitutional in nature.

right to self-representation, I need not express an opinion on the issues of jury nullification and the charge to the jury. With regard to these latter questions, Judge Leventhal's statement of the law is wholly acceptable.

A careful review of the transcript of the proceedings with respect to defendants' motions to dispense with counsel indicates that the defendants on many occasions interrupted the proceeding for various reasons, despite the fact they were represented by counsel at that time. The printed record cannot inform us whether such interruptions were violent, impolite, contemptuous, or made with an impertinent or sarcastic tone of voice. However more than once the judge had to threaten intervention by the marshals to impress upon defendants that they had to obey orders of the court to be seated. At other times, the language used by the defendants appeared to be disrespectful or even rude. That the trial judge appeared to tolerate many instances of this type of behavior, and even engaged in discourse with defendants, does not prove that he acquiesced in such extraordinary tactics, but rather indicates that he was attempting to preserve some sort of order.

Although it may be argued that there are some things in the judicial process more important than decorum in a courtroom, we are not faced with such perplexing alternatives here. Dissent is a healthy manifestation of the freedoms we as a nation profess and cherish. And a criminal trial might serve as the seed around which a point of view may crystallize. But a courtroom is not an arena in which dissention, particularly of a disruptive nature, may supplant, or even take precedence over, the task of administering justice.

As mentioned earlier, it is not without significance that this trial occurred at a time when the judicial system was being subjected to great stress because of the actions of some defendants and attorneys. The trial judge was surely aware of the publicity that attended the commission of the charged crimes, and the notoriety the trial itself would achieve. To paraphrase a slogan of the "new left", he did not have to be a weatherman to tell which way the wind was blowing.

Although a gale may have been raging in the courts at that time, challenging the very assumptions upon which our system of justice is based, a countercurrent was also evident. Only a month after the trial here in question, the Supreme Court delivered its opinion in Illinois v. Allen, *supra*. There, the various justices gave notice that they were aware of the storm and the damage it could wreak, and that they were determined that the judiciary have the ability to steer clear of the danger.[2]

---

2. Mr. Justice Black, writing for the majority, expressed the concerns of the bench, the bar, and the majority of citizens who were aware of what was occurring:
"* * * But our courts, palladiums of liberty as they are, cannot be treated disrespectfully with impunity. Nor can the accused be permitted by his disruptive conduct indefinitely to avoid being tried on the charges brought against him. It would degrade our country and our judicial system to permit our courts to be bullied, insulted, and humiliated and their orderly progress thwarted and obstructed by defendants brought before them charged with crimes. As guardians of the public welfare, our state and federal judicial systems strive to administer equal justice to the rich and the poor, the good and the bad, the native and foreign born of every race, nationality, and religion. Being manned by humans, the courts are not perfect and are bound to make some errors. But, if our courts are to remain what the Founders intended, the citadels of justice, their proceedings cannot and must not be infected with the sort of scurrilous, abusive language and conduct paraded before the Illinois trial judge in this case." 397 U.S. at 346–347, 90 S.Ct. at 1062.

Justice Brennan, recognizing the importance of orderly trials, also set forth his views in a concurring opinion:
"* * * The degree of liberty and equality that exists today has been the

Certainly, what transpired here, coupled with the real threat of further disruption, was sufficient to alert the trial judge to what could be expected if the motions to dispense with counsel were granted. Thus, his determination that to grant the motions would turn the trial into a shambles does not appear to be unreasonable.

Accordingly, I would conclude that defendants had, by their conduct, waived their right to proceed pro se, and would affirm the rulings by the district court that the defendants in these circumstances had to be represented by counsel. Based on this and on Judge Leventhal's opinion with regard to nullification and the charge, I would affirm the judgments of convictions.

On Appellee's Petition for Rehearing and Suggestion for Rehearing En Banc

LEVENTHAL, Circuit Judge:

The Government's petition for rehearing leads us to amplify our opinion.

1. The Government argues that defendant's right to defend himself at trial is not absolute, and cites the Standards Relating to the Function of the Trial Judge (ABA Project on Standards for Criminal Justice, § 6.6, Tentative Draft, June 1972, at 85), which states in pertinent commentary:

> product of unceasing struggle and sacrifice. Much remains to be done—so much that the very institutions of our society have come under challenge. Hence, today, as in Lincoln's time, a man may ask 'whether [this] nation or any nation so conceived and so dedicated can long endure'. It cannot endure if the Nation falls short on the guarantees of liberty, justice, and equality embodied in our founding documents. But it also cannot endure if we allow our precious heritage of ordered liberty to be ripped apart amid the sound and fury of our time. It cannot endure if in individual cases the claims of social peace and order on the one side and of personal liberty on the other cannot be mutually resolved in the forum designated by the Constitution. If that resolution cannot

Moreover, the interest of the public in an orderly, rational trial is entitled to consideration in determining the defendant's right to appear *pro se*. *See* United States v. Bentvena, 319 F.2d 916, 937 (2d Cir. 1963); Butler v. United States, 317 F.2d 249, 258 (8th Cir. 1963).

We agree with this statement to the extent set forth in our opinion, including *e. g.*, that a defendant's disruption may waive his right to pro se representation. We note that both *Butler,* cited in our opinion (at fn. 14), and *Bentvena,* are cases involving requests for pro se representation made after the commencement of trial—a situation that, as our opinion points out, is entirely different from that of a pro se claim made timely before trial begins. Indeed in *Bentvena* the court stated, 319 F.2d at 938:

> One charged with crime has an absolute right to do without an attorney and conduct his own defense (28 U.S.C. § 1654), but that is quite different from the right to discharge counsel after trial has begun. This latter right is a qualified one.

2. The petition for rehearing submits:

> With particular regard to the value of an orderly trial, we believe that a trial judge should have authority to engraft reasonable conditions on the

> be reached by judicial trial in a court of law, it will be reached elsewhere and by other means, and there will be grave danger that liberty, equality, and the order essential to both will be lost." *Id.* at 348, 90 S.Ct. at 1063.

And Justice Douglas, also cognizant of the threat posed by the strategy of disruption, stated in a separate opinion:

> "I agree with the Court that a criminal trial, in the constitutional sense, cannot take place where the courtroom is a bedlam and either the accused or the judge is hurling epithets at the other. A courtroom is a hallowed place where trials must proceed with dignity and not become occasions for entertainment by the participants, by extraneous persons, by modern mass media, or otherwise."

exercise of a defendant's right of self-representation.

It suffices to say that this case did not present a situation where the trial judge sought to prescribe reasonable conditions to accompany pro se representation. We do not have before us whether, or in what manner, a trial judge could prescribe conditions for the purpose of assuring a trial without disruption—to carry out the implied premise that there will be reasonable cooperation from the defendants, as opposed to any manipulation of the trial process so as to interfere with fair administration of justice.

■ 3. The Government stresses a contention that the court's opinion improperly bypasses the doctrine of harmless error. Apart from the matters set forth in the opinion already filed, we observe that if the conventional doctrine of harmless error is applied, it will in effect undercut the right of pro se representation, since rarely if ever can there be a showing of prejudice in terms of result from the conduct of a trial by counsel. There is no requirement of a showing of prejudice when counsel has been denied. A like rule is applicable, although for different reasons, when pro se representation is denied.

■ 4. The Government objects that our opinion means that any denial of pro se representation will per se require reversal. It does not require reversal in a case where the trial judge makes findings of defendants' prior disruption, or refusal to assure reasonable cooperation, or inability to waive counsel, etc. The effort to cope with the problem of disruptions necessarily puts an obligation on the trial judge * to stake out the considerations explicitly and with care. In the absence of some exposition of an appropriate basis for denying his right, the defendant is entitled to a trial

---

* See Mayberry v. Pennsylvania, 400 U.S. 455, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971). The need for the contempt issue to be determined by a different judge means that

at which he is accorded his right to represent himself.

Petition for rehearing denied.

Circuit Judge ADAMS dissents.

the trial judge must take pains to develop a clear and complete record permitting a sound and fair resolution.